*30*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOE B. MCDUFFIE and<br>KATHERINE MCDUFFIE<br>Plaintiffs, | §<br>§<br>§<br>§ | |
| vs. | §<br>§<br>§ | Civil Action No. B-01-143 |
| GUILLERMO SALINAS, JR.,<br>HECTOR GARZA, JENNIFER<br>KEESE, WILLACY COUNTY<br>SHERIFF'S DEPARTMENT, and<br>WILLACY COUNTY NAVIGATION<br>DISTRICT<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§ | |

United States District Court
Southern District of Texas
FILED

**MAR 2 5 2002**

Michael N. Milby
Clerk of Court

---

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
## GUILLERMO SALINAS, JR.  AND HECTOR GARZA

---

### TO THE HONORABLE JUDGE OF SAID COURT:

Defendants GUILLERMO SALINAS, JR.  and HECTOR GARZA, (hereinafter referred to as "Deputies Salinas and Garza"), file this Motion for Summary Judgment pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, and would respectfully show this Honorable Court the following:

### I.
### SUMMARY OF MOTION

Plaintiff Joe McDuffie files this suit against Willacy County Sheriff's Deputies Salinas and Garza complaining about the Deputies' participation in the issuing and execution of an arrest warrant for Plaintiff Joe McDuffie. Plaintiff alleges the Deputies violated state and federal law, primarily complaining of violation of his constitutional rights to be free from unreasonable force, malicious prosecution, false arrest, and false imprisonment.  These claims should be disposed of by summary judgment because Plaintiff fails to state a cause of action, and Deputies Garza and Salinas are immune from these claims as a matter of law.

## II.
## STATEMENT OF FACTS

A.      This lawsuit arises from the participation of Willacy County Sheriff's Deputies Salinas and Garza in the issuance and execution of an arrest warrant for Plaintiff Joe McDuffie.

B.      Plaintiff and his wife reside in a residential neighborhood in Port Mansfield, a community under the jurisdiction of the Willacy County Navigation District, Willacy County, Texas. On or about December 15, 2000, Plaintiff was at his home when he shot at and struck a dog with what he alleges was his 410 shotgun. *See* EXHIBIT 1, Excerpts of the Deposition of Joe B. McDuffie, pp. 72-73. Plaintiff claims that the dog was in his yard, threatening to harm Plaintiff's dog. *Id* at p. 73. Plaintiff did not report the shooting incident to local law enforcement or to the Willacy County Navigation District. *Id* at pp. 81-82.

C.      Defendant Jennifer Keese claims that she witnessed the shooting. *See* EXHIBIT 2, Excerpts of the Deposition of Jennifer Keese, p. 52. She reported the incident that day to the Willacy County Sheriff's Department. *Id* at p. 55. Defendant Keese spoke to Deputy Nichols, who told her to go to the Sheriff's Department to make a report. *Id* at p. 59.

D.      On or about December 20, 2000, Defendant Keese went to the Willacy County Sheriff's Department to file a complaint regarding the dog shooting incident. *Id* at p. 60. She was directed to Deputy Salinas to take the report. Defendant Keese did not know Deputy Salinas prior to that date. *Id* at p. 61. Defendant Keese told Deputy Salinas that she witnessed Plaintiff shooting a dog in the road, and that the shot was fired in the direction of a school bus in a residential area. Deputy Salinas typed up the information she gave him, which she read and had an opportunity to correct. *Id* at p. 62. Deputy Salinas took Defendant Keese to the Magistrate's office, where she signed the affidavit in front of a notary public. *See* EXHIBIT 3, Custodian of Records Affidavit for the Willacy County Sheriff's Department.

E.      Defendant Keese received a phone call sometime thereafter from the Magistrate's office. EXHIBIT 2, p. 65. She was told that the Court was going to issue a warrant, and Defendant Keese was asked to return to their office. Defendant Keese appeared in Court and was sworn in by

the Magistrate. *Id* at p. 66. Deputy Salinas was not there during that process. *Id*. The Court issued an arrest warrant for Plaintiff. EXHIBIT 3.

F.    On or about January 18, 2001, Deputy Garza and Deputy Noe Torres went to Plaintiff's home and arrested him on the outstanding warrant. EXHIBIT 3. The deputies transported Plaintiff to the Willacy County Sheriff's Department. Plaintiff complains that he was handcuffed tightly, leaving temporary indentations on his wrists that were gone in the morning. EXHIBIT 1, p. 106. Plaintiff appeared in front of the Magistrate before 9 a.m. the next day and was read his rights. EXHIBIT 3. Plaintiff posted bond and was released. The charges against Plaintiff were later dismissed for insufficient evidence. EXHIBIT 3.

G.    Plaintiff and his wife have a pre-existing and on-going dispute with Defendant Keese that continues at this time. EXHIBIT 1, pp. 23 - 47. Plaintiff believes that Defendant Keese is insane and is "demon possessed." *Id* at p. 45 - 46.

H.    On or about August 17, 2001, Plaintiff, appearing *pro se*, filed his Original Petition in the Willacy County District Court. The claim was timely removed to this Court by counsel for Deputies Salinas and Garza.

I.    In his most recently amended complaint, entitled "Third Amended Petition," Plaintiff asserts causes of action against Deputy Salinas unconstitutional arrest, malicious prosecution, "malicious harassment," false imprisonment, abuse of office, negligence, and violations of the TEXAS PENAL CODE. Plaintiff asserts causes of action against Deputy Garza for unconstitutional use of force and violations of the TEXAS PENAL CODE. *See* Plaintiffs' Third Amended Petition, attached hereto as EXHIBIT 4.[1]

I.    In response to Plaintiff's claims, Deputies Salinas and Garza file this Motion for Summary Judgment, asking this Court to dismiss, in whole or in part, the claims made against them.

---

[1] Plaintiff Katherine McDuffie does not allege any causes of action against Deputies Salinas and Garza. Her claims are only asserted against the Willacy County Sheriff's Department and the Willacy County Navigation District. Those Defendants both currently have Rule 12(b)(6) Motions pending before the Court.

## II.
### SUMMARY JUDGMENT EVIDENCE

In addition to the pleadings and discovery on file with this Court, Defendants rely on the following evidence by reference:

| | |
|---|---|
| Exhibit 1: | Excerpts of the Deposition of Joe B. McDuffie |
| Exhibit 2: | Excerpts of Deposition of Jennifer Keese |
| Exhibit 3: | Affidavit of Custodian of Records–Willacy County Sheriff's Department |
| Exhibit 4: | Plaintiff's Third Amended Petition |
| Exhibit 5: | Affidavit of Sheriff Larry Spence |

## IV.
### Summary Judgment Standard

Summary Judgment is proper where the movant demonstrates there is no genuine issue as to any material fact. *See* Rule 56(c), FEDERAL RULES OF CIVIL PROCEDURE; *see also*, *EEOC v. Southern Publishing Co.*, 894 F.2d 785, 788 (5th Cir. 1990). The moving party may discharge its summary judgment burden by pointing out to the District Court that there is an absence of evidence to support the non-moving party's case. *Id.*

The mere existence of a factual dispute is not sufficient to defeat summary judgment. Instead, a factual dispute must be "genuine" and "material." A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See, Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989). A fact is "material" if it might effect the outcome of the suit under the governing substantive law. *Id.*

In the case at bar, Plaintiff cannot establish the existence of every element essential to his causes of action, nor can he overcome the conclusive evidence of the Deputies' defenses. Consequently, this Court should enter Summary Judgment in Defendants' favor.

## V.
### DISMISSAL OF CLAIMS AGAINST DEPUTY SALINAS

### A.    Dismissal of Wrongful Arrest Claims Based on Spelling on the Warrant.

Plaintiff claims that his arrest was unconstitutional because the warrant was issued in the name of "Joe B. McDuffy," when Plaintiff's correct name is "Joe B. McDuffie." The misspelling

of Plaintiff's name on the warrant does not constitute a constitutional violation. There is no dispute that the warrant was issued for Plaintiff and that Plaintiff was the individual arrested.

When there is a discrepancy between the stated and actual name, this discrepancy will not invalidate the warrant or indictment so long as the names sound alike or it is difficult for the attentive ear to distinguish them when pronounced. *Johnson v. Estelle*, 704 F.2d 232, 236 (5th Cir. 1983) *cert. den.* 465 U.S. 1009 (1984); *Rodriguez v. State of Texas*, 363 S.W.2d 472, 473 (Tex.Crim.App. 1962)(finding discrepancy between "Rodriguez" and "Rodriquiz" immaterial). This doctrine is known as "*idem sonans*."

Only when the slight variance results in a totally different name has it been found fatal. *Smith v. State of Texas*, 763 S.W.2d 836, 839 (Tex.App.–Dallas 1988, writ denied). When the variance just results in the name being misspelled, there is no effect. *Id*. Clearly "McDuffie" and "McDuffy" share the same pronunciation, and the latter constitutes merely a misspelling of the true name. Pursuant to the doctrine of *idem sonans*, the misspelling on the warrant has no impact on the warrant's validity.

Moreover, there is no evidence that Deputy Salinas prepared, issued, or executed the warrant. *See* EXHIBIT 2, p. 65 and EXHIBIT 3. Furthermore, as discussed below, Deputy Salinas is immune from Plaintiff's claims. Deputy Salinas is entitled to judgement dismissing Plaintiff's claims for any constitutional violation arising from the misspelled name on the warrant.

## B.    Dismissal of Wrongful Imprisonment/False Arrest Claims.

Plaintiff claims that he was wrongfully imprisoned and falsely arrested by Deputy Salinas, as his arrest was effected without probable cause. Plaintiff does not state a proper cause of action for these claims.

Under Texas law, claims for false arrest or wrongful imprisonment require proof that there was *1)* willful detention; *2)* without consent; and *3)* without authority of law. *Pete v. Metcalfe*, 8 F.3d 214, 218 (5th Cir. 1993). To constitute a violation of the Fourth Amendment, the arrest must not have been effected with probable cause. *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998).

There is no evidence that Deputy Salinas detained Plaintiff in any way. Deputy Salinas typed a probable cause affidavit sworn to by someone else. EXHIBIT 2, p. 62. The undisputed evidence is that the Magistrate issued a warrant without any testimony or participation from Deputy Salinas. EXHIBIT 3, p. 66. There is no evidence that Deputy Salinas participated in Plaintiff's arrest, as Plaintiff was arrested by Deputies Garza and Torres. Plaintiff was detained pursuant to a facially valid warrant issued by the Magistrate. Thus, the Court's determination of probable cause precludes Plaintiff's causes of action. Moreover, as discussed below, Deputy Salinas is entitled to immunity from Plaintiff's claims. As a result, Deputy Salinas is entitled to dismissal of these claims as a matter of law.

### C.    Dismissal of Malicious Prosecution Claims.

Plaintiff claims that he was maliciously prosecuted by Deputy Salinas, as his arrest was not effected with probable cause. To prevail on a claim for malicious prosecution, Plaintiff must prove that 1) a criminal action was commenced against him; 2) the prosecution was caused or aided by Deputy Salinas; 3) the action was terminated in Plaintiff's favor; 4) Plaintiff was innocent; 5) Deputy Salinas acted without probable cause; 6) Deputy Salinas acted with malice; and 7) the criminal proceeding damaged Plaintiff. *Kerr v. Lyford*, 171 F.3d 330, 341 (5th Cir. 1999).

In the case at bar, the only evidence of conduct by Deputy Salinas is that he prepared a report reflecting Defendant Keese's complaint, he typed Defendant Keese's affidavit, and he accompanied her when she signed the affidavit in front of the notary public. He did not execute an affidavit in support of the warrant, nor did he offer any testimony. In fact, the undisputed evidence is that Deputy Salinas was not even present when the warrant was issued. As a matter of law, Deputy Salinas' conduct cannot constitute "aiding or causing" a prosecution.

Moreover, evidence of probable cause is a complete bar to maintaining this cause of action. *Kerr*, 171 F.3d at 341. To the extent that the facts implicated in the probable cause determination are undisputed, the Court may resolve the issue as a matter of law. *Id* at 340. In this case probable cause was determined by the Magistrate, who issued the warrant. The undisputed evidence is that

Deputy Salinas was not even present when the warrant was issued. Thus, he had no role in the Court's determination of probable cause.

Moreover, there is more than sufficient evidence of probable cause. Probable cause exists if the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a reasonable officer's belief that the citizen committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89 (1964). Defendant Keese swore under oath that she witnessed Plaintiff shooting a dog that was in the road, and that the shooting was in the direction of a school bus. An officer is entitled to rely on an eyewitness account in making a determination of probable cause, and does not have to take additional steps to corroborate the information. *Morris v. Dillard Department Stores, Inc.*, 2001 U.S.App. LEXIS 27184 (5th Circuit, December 26, 2001). The statement by Defendant Keese constitutes sufficient evidence that Plaintiff may have violated the law. There is no general requirement that the officer secure "both sides" of the story in order to determine probable cause. *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 121 (Tex.App.–Houston[1st Dist.] 1995, nwh).

Probable cause does not require any showing that the belief an offense was committed be correct or more likely true than false. *Texas v. Brown*, 460 U.S. 730, 742 (1983). Since there was probable cause to arrest, there can be no malicious prosecution.

In addition, there can be no malicious prosecution claim without evidence of malice. In this case, the undisputed evidence is that Deputy Salinas had no personal or professional relationship with the Plaintiffs or Defendant Keese prior to the incident at issue in this litigation. He became involved in this matter merely because he was the officer on duty when Defendant Keese came in to make her report. Deputy Salinas took the report, typed Defendant Keese's complaint, and directed her to the Magistrate. There is no evidence of malice, ill will, or improper purpose.

To recover for a constitutional tort, Plaintiff must present evidence that establishes misconduct, even evidence of negligence is not enough. *Sanders v. English*, 950 F.2d 1152, 1159 (5th Cir. 1992). Moreover, Deputy Salinas is entitled to qualified and official immunity for any claim

arising from Plaintiff's prosecution, as discussed below. As a result, this cause of action should be dismissed as a matter of law.

### D.   Dismissal of Plaintiff's Claims for Violation of the Texas Penal Code.

Plaintiff alleges causes of action against Deputy Salinas for alleged violation of Sections 39.03 and 37.10, of the TEXAS PENAL CODE (entitled Abuse of Office–Official Oppression and Tampering with a Governmental Record, respectively). Since there is no civil cause of action under either section of the Penal Code, Deputy Salinas is entitled to summary judgment on these claims as a matter of law.

The TEXAS PENAL CODE does not create civil causes of action that can be asserted by private individuals. *A.H. Belo Corp. v. Corcoran*, 52 S.W.3d 375, 379 (Tex.App.–Houston[1st Dist] 2001, nwh); *Aguilar v. Chastain*, 923 S.W.2d 740, 745 (Tex.App.–Tyler 1996, WD). In *Aguilar*, the plaintiff asserted several causes of action under Chapter 39 of the TEXAS PENAL CODE. The Court dismissed these claims as a matter of law, noting that no private causes of action are created by Texas criminal laws. *Id.* Deputy Salinas is entitled to judgment as a matter of law on Plaintiff's claims for violation of the TEXAS PENAL CODE, as Plaintiff fails to state a claim for a recognized civil cause of action.

### E.   Dismissal of Plaintiff's Negligence/Gross Negligence Claims.

Plaintiff claims that Deputy Salinas was negligent by an act of omission. The only act of omission identified by Plaintiff in discovery is related to Plaintiff's complaint that Deputy Salinas did not investigate Defendant Keese's complaint before allowing her to appear before the Magistrate. There is no evidence that allowing someone to present their complaint to a Magistrate can constitute negligence. Moreover, as discussed above, the undisputed evidence is that there was probable cause to arrest based on the information provided by Defendant Keese.

Lastly, the determination of how and to what extent to investigate is a discretionary function. *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 121 (Tex.App.–Houston [1st Dist.] 1995, nwh). As

discussed in detail below, Deputy Salinas is entitled to immunity from complaints regarding his investigation as a matter of law.

### F.    Dismissal of Malicious Harassment Claims.

Plaintiff claims that his constitutional rights were violated by Deputy Salinas by his alleged "retaliation, intimidation and belittling" that interfered with the Declaration of Independence's guarantee of an inalienable right to life, liberty and the pursuit of happiness. Plaintiff fails to state a proper cause of action for the conduct he complains of, and thus, this complaint should be dismissed. There is no general constitutional entitlement to the "pursuit of happiness."

Moreover, there is no evidence of any "retaliation, intimidation or belittling" by Deputy Salinas. The evidence only establishes that Deputy Salinas took a citizen's sworn complaint and submitted it to the Magistrate. There is no evidence of any personal interaction between Plaintiff and Deputy Salinas that qualifies for the description assigned by Plaintiff, or any cause of action that could reasonably arise from the same. As a matter of law, this claim should be dismissed.

## V.
## DISMISSAL OF THE CLAIMS AGAINST DEPUTY GARZA

### A.    Dismissal of Plaintiff's Unreasonable Force Claims.

Plaintiff complains that he was subjected to unreasonable force in violation of the Eighth Amendment. Taking Plaintiff's complaint as true, for the purposes of this Motion only, the only force alleged by Plaintiff is that Deputy Garza  handcuffed Plaintiff tightly while transporting him to jail.

First, the Eighth Amendment only protects those that have been convicted of a crime. *Ingraham v. Wright*, 430 U.S. 651, 664 (1977). It does not protect pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). As a result, Plaintiff's Eighth Amendment claim must fail as a matter of law.

Moreover, there is no evidence of unreasonable force in violation of the Fourth Amendment. Controlling law indicates that a constitutional violation does not occur every time an officer touches someone, and that *de minimis* uses of force does not constitute a violation as long as it is not "repugnant to the conscience of mankind." *Ikard v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996), citing *Hudson v. McMillian*, 503 U.S. 1 (1992).

To prevail on a claim for excessive force, Plaintiff must allege and prove: *1)* an injury which *2)* resulted directly and only from the use of excessive force that was clearly excessive to the need, and the excessiveness of which was *3)* objectively unreasonable. *See, e.g., Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir. 1993). The primary issue is whether the officer's conduct is objectively reasonable in light of the facts and circumstances confronting him, without regard to underlying intent or motivation. *Graham v. Connor*, 400 U.S. 386 (1989).

Handcuffing too tightly, and even causing swelling in the wrist, does not constitute an excessive use of force, as a matter of law. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). Moreover, Deputy Garza is entitled to immunity as a matter of law, as discussed in detail below. As a result, Deputy Garza is entitled to dismissal of the unreasonable use of force claim.

## B.     Dismissal of Plaintiff's Claims for Violation of the Texas Penal Code.

Plaintiff alleges a cause of action against Deputy Garza for alleged violation of Section 39.02, TEXAS PENAL CODE, Official Oppression. Plaintiff complains that Deputy Garza violated Section 14.06 of the TEXAS CODE OF CRIMINAL PROCEDURE, which requires that persons arrested be taken before the magistrate without unnecessary delay.

As discussed above, the TEXAS PENAL CODE does not create civil causes of action that can be asserted by private individuals. *A.H. Belo Corp.*, 52 S.W.3d at 379; *Aguilar*, 923 S.W.2d at 745. Deputy Garza is entitled to judgment as a matter of law on Plaintiff's Abuse of Office claims, as Plaintiff fails to state a claim for a recognized civil cause of action.

Moreover, there is no evidence that Deputy Garza violation Section 14.06 of the TEXAS CODE OF CRIMINAL PROCEDURE. Plaintiff was arrested at his home after eight o'clock in the

evening, arrived at the Willacy County jail less than an hour later, and was taken in front of the Magistrate before 9 a.m. the next morning. EXHIBIT 3. This is about a twelve hour lapse during non-business hours, and does not constitute "unnecessary delay," as matter of law. *See Jenkins v. State of Texas*, 912 S.W.2d 793, 807 (Tex.Crim.App. 1995)(taking arrestee before the magistrate 16 hours after the arrest satisfied the "without unnecessary delay" requirement).

Plaintiff complains that Deputy Salinas stopped at his home to pick up his dinner on his way to the Sheriff's Department. Deputy Salinas lives in Port Mansfield, the same community where Plaintiff resides. Plaintiff admits that Deputy Salinas was in his home for 60 to 90 seconds. EXHIBIT 1, p. 100-101. There is no evidence that this minimal detour constituted a violation of state or federal law.

As a result, Plaintiff's claims for violation of the TEXAS PENAL CODE and/or the TEXAS RULES OF CRIMINAL PROCEDURE should be dismissed as a matter of law.

## VI.
## DEPUTIES SALINAS AND GARZA ARE ENTITLED TO IMMUNITY

Deputies Salinas and Garza are further entitled dismissal of Plaintiff's claims on the basis of their qualified and official immunity. This defense is a product of the common law. It shifts the burden of pleading and proof. A party seeking damages from an official asserting immunity bears the burden of overcoming that defense. *Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989).

The Supreme Court and the Fifth Circuit have repeatedly held that qualified immunity is immunity from suit rather than a mere defense to liability. Moreover, these courts strongly encourage District Courts to dispose of lawsuits in which qualified immunity is apparent from the pleadings without resort to cumbersome and expensive discovery. *See, Saucier v. Katz*, 121 S. Ct. 2151 (2001); *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985); and *Streetman v. Jordan*, 918 F.2d 555, 556-557 (5th Cir. 1990).

Individual officials are entitled to immunity where they are acting in the course and scope of their governmental duties; in accordance with clearly established law; and in good faith. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity is defeated only where the claimant establishes that the official violated a clearly established constitutional right. *Anderson v. Creighton*, 483 U.S. 635 (1987). There is a presumption in favor of immunity for public servants acting in their official capacity. *State of Louisiana v. Public Investors, Inc.*, 35 F.3d 216 (5th Cir. 1994). Moreover, the right violated must be so clear that a reasonable official would understand that what he is doing violates that right. *Anderson*, 483 U.S. at 635. If reasonable public officials could differ on the lawfulness of the officer's action, then the officer is entitled to immunity. *Schultea v. Woods*, 27 F.3d 1112 (5th Cir. 1994).

There can be no dispute that both Deputies were acting in the course and scope of their discretionary duties at the times of their interaction with Plaintiff. Moreover, the undisputed evidence is that the Deputies were acting in good faith.

Deputy Salinas took a report from a complainant, typed up that report, and directed the complainant to the Notary Public. There is no evidence that Deputy Salinas did anything else to effect the arrest of Plaintiff. Reasonable officers in the same or similar positions to Deputy Salinas could handle the situation in the same manner. *See* EXHIBIT 5, Affidavit of Sheriff Larry G. Spence. There is no competent evidence that no reasonable officer would have handled the situation in the same manner.

Deputy Garza arrested Plaintiff pursuant to a facially valid warrant. There is no allegation of any physical force other than handcuffing. Taking Plaintiff's complaint as true, for the purposes of this Motion only, a reasonable officer in the same or similar circumstances could handcuff a suspect in such a way that the handcuffs leave temporary indentations on the skin. *See* EXHIBIT 5. Plaintiff appeared before the magistrate about twelve hours after his arrest. A reasonable officer could believe that such an appearance complied with Texas procedural requirements that an arrestee appear before the Magistrate without undue delay. *See* EXHIBIT 5. There is no competent evidence that no reasonable officer would have handled the situation in the same manner.

As a result, Deputies Salinas and Garza are entitled to official and qualified immunity from the claims made against them as a matter of law.

WHEREFORE, PREMISES CONSIDERED, Defendants Guillermo Salinas, Jr. and Hector Garza pray that the Court enter Judgement in their favor, dismissing all of Plaintiff's claims against them both; and for such other and further relief to which Defendants Salinas and Garza may be justly entitled.

Respectfully submitted,

**FLETCHER & SPRINGER, L.L.P.**
720 Brazos Street, Suite 1100
Austin, Texas 78701
(512) 476-5300 [voice]
(512) 476-5771 [facsimile]

William W. Krueger III
State Bar No. 11740530
Southern District No. 12827
Joanna R. Lippman
State Bar No. 00791122
Southern District No. 29464

Attorneys for Defendants
**Guillermo Salinas, Jr. and Hector Garza**

## Certificate of Service

I here certify that a true and correct copy of the foregoing and attached **Motion for Summary Judgment** of Defendants Guillermo Salinas, Jr. and Hector Garza has been provided to:

Joe and Katherine McDuffie, *pro se*
303 South Shore Drive
Port Mansfield, Texas 78598

Jennifer Keese, *pro se*
123 Beach St.
Port Mansfield, Texas 78598

Jaime Balli
**Adams & Graham, L.L.P.**
P.O. Drawer 1429
Harlingen, Texas 78551

by Certified Mail Return Receipt Requested on ___March 22___, 2002.

_Joanna Lippman_
Joanna R. Lippman

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOE B. MCDUFFIE                 ) (
KATHERINE MCDUFFIE              ) (
        Plaintiffs             ) (
                               ) (
VS.                            ) (   CIVIL ACTION NO. B-01-143
                               ) (
GUILLERMO SALINAS, JR.,        ) (
HECTOR GARZA and JENNIFER      ) (
KEESE                          ) (
        Defendants            ) (

---

ORAL DEPOSITION OF
JOE B. MCDUFFIE
DECEMBER 17, 2001



---

ORAL DEPOSITION OF JOE B. MCDUFFIE, produced as

a witness at the instance of the DEFENDANTS GUILLERMO

SALINAS, JR., AND HECTOR GARZA, taken in the above

styled and numbered cause on DECEMBER 17, 2001,

reported by DONNA McCOWN, Certified Court Reporter

No. 6625, in and for the State of Texas, at the offices

of Adams & Graham, L.L.P., 222 East Van Buren, West

Tower, Harlingen, Texas, pursuant to the Federal Rules

of Civil Procedure.



EXHIBIT
1

09:48:54  1      A.   Absolutely not.

09:48:58  2      Q.   Have you ever been involved in any workers'

09:49:00  3   compensation claims?

09:49:01  4      A.   Absolutely not.

09:49:12  5      Q.   Have you ever been involved in any type of

09:49:15  6   administrative complaints?

09:49:16  7      A.   No.

09:49:17  8      Q.   You've never filed any with any kind of

09:49:19  9   government entity complaining about the behavior of any

09:49:24 10   government agent?

09:49:24 11      A.   No.

09:49:44 12      Q.   From reading some of the things that have been

09:49:46 13   filed in this case, it appears that the dispute that

09:49:52 14   the McDuffies have with Jennifer Keese goes somewhat

09:49:55 15   beyond just what we're talking about in this lawsuit;

         16   is that correct?

09:50:01 17      A.   You're going to have to be more specific.

09:50:04 18      Q.   Well, let me just start here.  Who is Jennifer

09:50:07 19   Keese?

09:50:08 20      A.   Someone that we know by sight and circumstance.

09:50:11 21      Q.   All right.  How do you know her by sight?

09:50:14 22      A.   Well, I know what she looks like.

09:50:16 23      Q.   How do you know that that's who she is, that

09:50:19 24   her name is Jennifer Keese?

09:50:20 25      A.   She was identified to me.

09:50:21  1    Q.   You had never met her?

09:50:22  2    A.   No.  Well, I did meet her once, yes.

09:50:26  3    Q.   How was she identified to you?

09:50:28  4    A.   Well, someone told me that was her name.

09:50:30  5    Q.   Okay.  When was that?

09:50:32  6    A.   Oh, I don't recall.  Sometime since they moved

09:50:35  7    there.

09:50:36  8    Q.   When did they move there?

09:50:38  9    A.   Well, I think they came after us.  I think they

09:50:43  10   came after we moved to that house.  I think they must

09:50:46  11   have came there -- they must have came there in '97 or

09:50:51  12   '98.  I'm not sure to tell you the truth.

09:50:59  13   Q.   And who told you who they were?

09:51:02  14   A.   I can't even remember that.

09:51:04  15   Q.   Okay.  Why did they tell you who they were?

09:51:08  16   A.   I don't know.  It was just a conversation.  It

09:51:10  17   was like maybe at the fishing tournament or something.

09:51:14  18   I had known about a circumstance where she had gone to

09:51:23  19   the school and made some statements about my wife, some

09:51:32  20   extraneous, erroneous, well, outright fabrications for

09:51:39  21   unknown reasons.

09:51:41  22          And I think at the tournament one year I

09:51:47  23   asked someone, I said, you know -- I don't even know

09:51:50  24   who this person was.  I said, "Could you point them out

09:51:52  25   to me?"  I think that's the way it went.  And they

09:51:54 1     said, "Well, that's her right there."

09:51:55 2         Q.   Okay.   So when the incident with the school

09:51:58 3     occurred, you had never met Ms. Keese and actually

09:52:01 4     didn't know who she was?

09:52:02 5         A.   No, absolutely not.

09:52:03 6         Q.   Now, tell me what it is that happened with the

09:52:04 7     school.

09:52:05 8         A.   Well, she -- my wife told me that -- came in

09:52:10 9     from school one day and told me that she had been down

09:52:13 10    there and was complaining about my wife being a

09:52:19 11    substitute teacher there and volunteering in the

09:52:22 12    classroom and didn't want her there anymore because,

09:52:25 13    quote/unquote, she was going to be a defendant in a

09:52:31 14    lawsuit brought by some friends of hers.

09:52:33 15              Now, I know this sounds really strange to

09:52:36 16    you as it did to me, but that's exactly the way it

09:52:49 17    went.   Later conversations with the schoolteacher and

09:52:49 18    the principal confirmed this.

09:52:51 19        Q.   All right.   Let me just back up.

09:52:53 20        A.   Okay.

09:52:53 21        Q.   You learned from your wife when she comes home

09:52:56 22    from school.   You don't remember when this

09:52:57 23    conversation --

09:52:58 24        A.   I don't remember what day, yeah.

09:53:00 25        Q.   She comes home.   She tells you that Ms. Keese

09:53:03 1  had complained about her being a substitute teacher

09:53:05 2  because Mrs. McDuffie was going to be a defendant in a

09:53:08 3  lawsuit that her friends were going to file?

09:53:10 4     A.  Yeah, exactly.  As bizarre and that sounds,

09:53:15 5  that is the case.

09:53:17 6     Q.  All right.  After you learn of that, what's the

09:53:21 7  next involvement you have in that issue?

09:53:24 8     A.  I didn't have any involvement in that issue at

09:53:30 9  all.  My wife did.  My wife, you know, once she was

09:53:34 10  confronted by it, you know -- I think was -- something

09:53:39 11  happened, like the principal said, "Well, you know,

09:53:41 12  she's down here" -- can I speak freely?

09:53:44 13     Q.  Yeah.

09:53:44 14     A.  He said, "She's down here raising hell and

09:53:46 15  threatening to take her kids out."  I mean, the woman

09:53:50 16  is a lunatic.

09:53:51 17     Q.  Who is the principal?  What's the principal's

09:53:51 18  name?

09:53:52 19     A.  Mireles.

09:53:53 20     Q.  I'm sorry?

09:53:55 21     A.  Heberto Mireles, M-I-R-E-L-E-S.  And he coward

09:54:00 22  to them.  These people are bullies.  They're motorcycle

09:54:04 23  trash is what they are.  And they've been bullies all

09:54:06 24  their life.

09:54:07 25            And I'm pretty sure they probably got ran

09:54:09 1   off from where they lived before and that's how they

09:54:11 2   wound up in Port Mansfield.  But at any rate, that's

09:54:15 3   getting off on a tangent.

09:54:16 4         And the principal coward to them, you

09:54:19 5   know, told Kathy, said, "Well, maybe you ought to take

09:54:21 6   off, you know."  Lay low for a while I think was the

09:54:25 7   words he used.  Some months went by, and -- if you'd

09:54:36 8   like me to continue the story.

09:54:38 9   Q.   Sure.

09:54:40 10  A.   Some months went by, and there was -- she works

09:54:43 11  as a barmaid.

09:54:46 12  Q.   She being Jennifer Keese?

09:54:48 13  A.   Yes.  You know, in a local beer joint, a dive

09:54:54 14  establishment that's located in the Port Mansfield

09:54:58 15  entity.  It's a place that should have been shut down a

09:55:02 16  long time ago because of the fact that they insist on

09:55:05 17  serving alcohol to people that are way over the limit.

09:55:08 18        I've had several incidents where I almost

09:55:11 19  had accidents with people pulling out in front of me

09:55:13 20  there and so on and so forth.

09:55:15 21        At any rate, they had a fight in that bar

09:55:17 22  one night when the original owners were on vacation and

09:55:22 23  Ms. Keese was left in charge.  And that establishment,

09:55:30 24  as far as I was concerned, should be put out of

09:55:35 25  business.

| | |
|---|---|
| 09:56:32 1 | You're out this evening.  We don't even know when this |
| 09:56:35 2 | is, right? |
| 09:56:35 3 | A.  Yeah. |
| 09:56:36 4 | Q.  What month?  What season? |
| 09:56:37 5 | A.  Yeah.  Well, yeah, it was in the summertime. |
| 09:56:39 6 | Q.  All right.  And you're driving down the street, |
| 09:56:42 7 | and you see police and an ambulance at Pelican's? |
| 09:56:46 8 | A.  Yeah. |
| 09:56:46 9 | Q.  So did y'all stay there? |
| 09:56:48 10 | A.  No. |
| 09:56:49 11 | Q.  You just saw them there? |
| 09:56:51 12 | A.  That's right. |
| 09:56:51 13 | Q.  What did you find out next? |
| 09:56:54 14 | A.  We heard from an eyewitness that someone had |
| 09:56:57 15 | been knocked down and drug out and hospitalized.  And |
| 09:57:03 16 | so having that information, I went to the Texas |
| 09:57:06 17 | Alcoholic Beverage Commission a few days later because |
| 09:57:10 18 | I figured that the way things are done in Port |
| 09:57:14 19 | Mansfield and have been for years, sure enough, they |
| 09:57:17 20 | didn't report it. |
| 09:57:18 21 | Q.  All right. |
| 09:57:19 22 | A.  You know, try to just kind of sweep it under |
| 09:57:20 23 | the rug.  So the TABC brought an administrative action |
| 09:57:24 24 | against them. |
| 09:57:24 25 | Q.  All right.  Let me back up. |

09:55:36  1         And so any excuse I could find, you know,

09:55:38  2  to have TABC investigate, I was looking for it.  So I

09:55:43  3  heard that there was a fight there while she was the

09:55:45  4  manager there and the owners were gone.  And so I --

09:55:52  5  incidentally, I didn't know she was the manager there

09:55:54  6  until later.

09:55:56  7      Q.  All right.  I want to make sure I've got the

09:55:58  8  context right.

09:55:59  9      A.  Yeah, okay.

09:56:00  10     Q.  You find out there's a fight going on.  What's

09:56:02  11  the name of this bar?

09:56:03  12     A.  Pelican's.

09:56:06  13     Q.  All right.  So how do you know there's a fight

09:56:08  14  going on?

09:56:09  15     A.  Well, we saw the ambulances and the sheriff

09:56:10  16  department there and saw somebody hauled out, and then

09:56:14  17  we heard, you know, an eyewitness.

09:56:16  18     Q.  Okay.  You're finding all this out that day,

09:56:20  19  like, while it's happening?

09:56:21  20     A.  Well, yeah, that evening or whatever it was.

09:56:23  21     Q.  All right.

09:56:24  22     A.  And subsequently, we contacted Texas Alcoholic

09:56:27  23  Beverage Commission because we know there's reporting

09:56:30  24  requirements.

09:56:31  25     Q.  All right.  Well, let me back up for a minute.

09:57:26 1     A.   And Ms. Keese was the, you know, manager at the

09:57:30 2   time.

09:57:31 3     Q.   All right.  When you went to TABC, you actually

09:57:33 4   came to Austin and reported it?

09:57:34 5     A.   No, no, no.  I did it on the Internet.

09:57:36 6     Q.   All right.  And as a result of that --

09:57:44 7     A.   As a result of that, the next -- within the

09:57:48 8   next few weeks, every time Ms. Keese would meet me on

09:57:52 9   the road, she'd go like this, and I'm gesturing the old

09:57:57 10   shooting the finger.

09:57:59 11     Q.   All right.  So you called TABC.  TABC filed

09:58:03 12   administrative charges against --

09:58:05 13     A.   That's right.  They filed administrative action

09:58:08 14   against their certificate.

09:58:10 15     Q.   And what happened with those charges?

09:58:14 16     A.   I don't know what the disposition was.  All I

09:58:16 17   know is that they either fined them or they sanctioned

09:58:19 18   them.  They did something.

09:58:20 19     Q.   And after that, you said when you'd see

09:58:22 20   Ms. Keese she would give you the finger?

09:58:24 21     A.   Absolutely, yeah.

09:58:26 22     Q.   And how is it that you think she knew that you

09:58:30 23   had anything to do with it?

09:58:31 24     A.   Because administrative rules with the TABC is

09:58:35 25   that if somebody files a complaint and an

09:58:38 1    administrative action is taken against the certificate,

09:58:41 2    upon asking, they will reveal the name of the

09:58:44 3    complainant.

09:58:44 4        Q.  All right.  And you actually filed a complaint

09:58:46 5    as opposed to just telling them what happened?

09:58:49 6        A.  That's correct, and used my name.  And so that

09:58:59 7    added fuel to the fire.  She's really hated us ever

09:58:59 8    since then and even more.

09:59:02 9        Q.  Okay.  And this all happened after the incident

09:59:04 10   with the school?

09:59:05 11       A.  That's correct.

09:59:07 12             MRS. MCDUFFIE:  That's the summer before.

09:59:10 13             THE WITNESS:  I'm sorry.  Okay.  That was

09:59:10 14   the summer before.  I got my dates mixed up.  Big deal.

09:59:14 15       Q.  Well, that's what I want to make sure I

09:59:15 16   understand.

09:59:16 17       A.  Okay.

09:59:16 18       Q.  You told me that you didn't know anything about

09:59:19 19   who Jennifer Keese was when she went and complained

09:59:21 20   about the substitute teacher incident, but now what

09:59:23 21   you're telling me is you actually did know who she was.

09:59:25 22   You did not?

09:59:27 23             THE WITNESS:  Well, when did I -- when did

09:59:28 24   I know who she was?  Can I ask her?

09:59:30 25       Q.  No.  You need to tell me what you remember.

09:59:33 1      A.   I don't remember when I came to know who she

09:59:35 2  was.   I don't remember if it was before the school

09:59:37 3  incident or before the bar incident.   Okay.   I don't

09:59:41 4  really remember.

09:59:42 5      Q.   As we sit here --

09:59:43 6      A.   Because she's such an insignificant little

09:59:48 7  cockroach.   All right?

09:59:50 8      Q.   All right.   So when you went to TABC with this

09:59:52 9  administrative complaint, you're not sure at this point

09:59:55 10 whether that occurred before or after the school

09:59:57 11 incident, or do you know?

10:00:01 12     A.   It occurred -- I guess that occurred before the

10:00:03 13 school incident.

10:00:04 14     Q.   All right.   Do you remember any contact with

10:00:07 15 Ms. Keese prior to this bar incident?

10:00:10 16     A.   Can I reiterate something?   I know that that

10:00:14 17 happened before the school incident because the school

10:00:15 18 incident was retaliation for that.   Now it becomes more

10:00:20 19 clear to me.   I'm sorry.   What was your question?

10:00:27 20     Q.   Okay.

10:00:28 21     A.   You have to excuse me for getting frustrated,

10:00:31 22 because when somebody treats you this way, it's just

10:00:32 23 real frustrating, you know.

10:00:35 24     Q.   All right.   So --

10:00:36 25     A.   When you have a lunatic on your tail, it's --

| | |
|---|---|
| 10:02:22 1 | let them in.  I can't remember how it went now.  I told |
| 10:02:24 2 | them, I said, "Well, just get out of the pool and come |
| 10:02:27 3 | on." |
| 10:02:27 4 | Q.  So how do you know any of this is happening? |
| 10:02:30 5 | You're not there, are you? |
| 10:02:31 6 | A.  They told me the story later. |
| 10:02:34 7 | Q.  Well, what you're telling me is that you then |
| 10:02:35 8 | told them to get out of the pool and come home, but how |
| 10:02:38 9 | did you have that conversation with them?  You were |
| 10:02:40 10 | there, or they called you on the phone? |
| 10:02:42 11 | A.  No.  They told me when they got home about this |
| 10:02:45 12 | stuff that happened before I, you know, got down there. |
| 10:02:50 13 | I went down there to get them. |
| 10:02:53 14 | Q.  That's where I'm confused.  When did you go |
| 10:02:56 15 | down?  After your kids came home or before? |
| 10:03:00 16 | A.  I did go back down there after the kids came |
| 10:03:03 17 | home. |
| 10:03:04 18 | Q.  Were you there before the kids came home? |
| 10:03:10 19 | A.  No, no.  I mean, I went down there to get them. |
| 10:03:15 20 | THE WITNESS:  What?  What? |
| 10:03:16 21 | MRS. MCDUFFIE:  You found them down there. |
| 10:03:18 22 | THE WITNESS:  I found them down there, |
| 10:03:19 23 | yeah. |
| 10:03:19 24 | Q.  All right.  I'm afraid that I don't understand |
| 10:03:21 25 | you.  So let's start all over.  Your kids are at the |

10:03:24 1    pool.  They're guests of someone.  The people they were

10:03:26 2    guests of leave.  Ms. Keese complains to Mr. Wilson

10:03:29 3    that she wants the kids gone because they're not

10:03:31 4    members.

10:03:32 5        A.  That's what the kids told me.

10:03:34 6        Q.  All right.  And then the kids tell you that

10:03:36 7    whatever Mr. Wilson did, they weren't kicked out.

10:03:39 8        A.  That's correct.

10:03:39 9        Q.  Okay.  What's your next interaction with this?

10:03:41 10       A.  Well, I took them home.

10:03:43 11       Q.  How did you end up there?

10:03:46 12       A.  I don't know.  I went down there to get them

10:03:49 13   for some reason.

10:03:50 14       Q.  That's what I'm trying to find out.  You came

10:03:51 15   down to pick them up?

10:03:53 16       A.  Yeah, yeah.  And I don't recall what

10:03:55 17   necessitated me to go down there and get them.  There

10:03:58 18   was a reason obviously.

10:04:03 19       Q.  All right.  So when you come down to get them,

10:04:05 20   did the kids tell you while you're there what happened

10:04:08 21   with Ms. Keese?

10:04:09 22       A.  Well, yeah.  They told me.  When I got home,

10:04:12 23   they told me the story.

10:04:12 24       Q.  When you were there at the pool, they didn't

10:04:14 25   tell you the story?

10:04:16 1    A.  They might have started or mentioned a few

10:04:18 2  things about it or something.  I don't know.

10:04:20 3    Q.  When you took them home from the pool --

10:04:22 4    A.  I don't see the relevance.  Where are we, you

10:04:25 5  know -- how is this likely to affect the outcome of

10:04:28 6  what we're talking about here?

10:04:30 7        I mean, this is -- this is, you know --

10:04:33 8  this is an extraneous incident.  It doesn't have

10:04:35 9  anything to do with the culpability or the guilt of

10:04:38 10  your two clients Hector and Guillermo.

10:04:41 11        MS. LIPPMAN:  I move to strike the

10:04:42 12  witness' comments.

10:04:44 13    Q.  When you leave the pool with the kids, you just

10:04:48 14  leave because it's time to go home, correct, not

10:04:50 15  because you were kicked out?

10:04:51 16    A.  Well, that's correct, yes.

10:04:53 17    Q.  Okay.  So you go home.  The kids tell you the

10:04:56 18  story, and what happens after that?

10:05:01 19    A.  Well, I was pretty incensed about it.

10:05:10 20    Q.  You were incensed by what?

10:05:10 21    A.  About the whole thing.  About her first, you

10:05:12 22  know, saying they could be -- trying to kick them out.

10:05:14 23  Then there was some exchange between her and Wilson,

10:05:16 24  and I don't really know what that exchange was, but

10:05:20 25  then, you know, all I know is that I got lied to

somewhere in the process.

Q.  Who did you get lied to by?

A.  I think, as I remember the events, Wilson lied to me.  He told me that she had let them in, and the kids told me, "No.  Wilson let us in."

Q.  All right.  See, and this is where I'm getting confused.  When you came and picked the kids up, you want and talked to Mr. Wilson?

A.  No.

Q.  So when did you --

A.  Well, I did -- yeah, I did talk to him when I was down there to get them.  I did talk to him.

Q.  Why?

A.  Well, I don't know.  I don't remember.

Q.  Okay.

A.  I think I asked him something to the effect of, "Why don't you have these people thrown out of here, you know, out of the neighborhood."  I mean, I understood, you know, that they could throw people out of there that were undesirable, and I was just wondering why it never happened.

Q.  All right.  And this is the first time you come by to pick up your kids, or is this when you come back later?

A.  I think that was the first time.

10:06:16  1      Q.  Why were you looking to get the Keeses thrown
10:06:19  2   out then?  Had your kids already told you that she
10:06:21  3   wanted them out?
10:06:22  4      A.  No.  You know, it was just, you know, because
10:06:24  5   of the things that had been ongoing for several months.
10:06:28  6   Okay.  And I was frustrated.
10:06:31  7      Q.  All right.  So you tell Mr. Wilson that you
10:06:33  8   want -- you don't understand why the Keese --
10:06:35  9      A.  Well, I just asked him, you know, kind of
10:06:35 10   halfway seriously and halfway facetious, "Why don't you
10:06:39 11   throw these people out of here."
10:06:41 12      Q.  All right.  What did Mr. Wilson say?
10:06:42 13      A.  He said, "Oh, I can't throw nobody out of
10:06:44 14   here."
10:06:46 15      Q.  Okay.  All right.  So then you get home.
10:06:48 16      A.  It was more of a joke then anything else.
10:06:51 17      Q.  All right.  Then the kids tell you that
10:06:53 18   Ms. Keese actually didn't want them to stay or
10:06:56 19   something?
10:06:56 20      A.  Well, she -- yeah, yeah.  She initially had
10:07:10 21   objected to them being there because their friends had
10:07:13 22   gone.  And she went and complained to him, see?
10:07:15 23           And then all of a sudden, you know,
10:07:19 24   after -- after the fact, after he said they could stay,
10:07:22 25   then she comes in and says, "Oh, well, they can stay on

10:07:25 1    my membership."

10:07:26 2            Well, I'm sorry, but that's a little bit

10:07:28 3    late, you know, to show a goodwill gesture, isn't it?

10:07:32 4    You know what I'm saying?  I mean, the original kids

10:07:36 5    that they had been a guest with there had left.  Okay?

10:07:39 6            When they left, Ms. Keese jumps up in her

10:07:42 7    typical, you know, demeanor and attitude and mind-set

10:07:49 8    and goes to him and says, "I want them out of here.

10:07:52 9    They're not members, and they don't have -- and the

10:07:55 10   people they were the guests of left."

10:07:57 11       Q.  And this is what your kids are telling you,

10:07:58 12   right?  You didn't see any of that interaction?

10:08:01 13       A.  I just didn't hear it from my kids.  I heard it

10:08:03 14   from all the other kids that were there too.

10:08:05 15       Q.  All the children told you that.  What about the

10:08:07 16   adults?  Did you talk to them?

10:08:12 17       A.  Yeah, I did.  I talked to him.

10:08:16 18       Q.  Other than Mr. Wilson, did you talk to any of

10:08:18 19   the other adults there at the pool about what happened?

10:08:20 20       A.  No.

10:08:20 21       Q.  When you talked to Mr. Wilson, what did

10:08:23 22   Mr. Wilson tell you?

10:08:24 23       A.  Well, he first tried to say that she was

10:08:32 24   letting them stay there on her membership, but see, she

10:08:36 25   reneged, and then he let them stay.  So, you know, for

10:08:39 1    some weird reason, he -- you know, he lies for her, and

10:08:43 2    it beats me as to why.

10:08:45 3            MR. BALLI:  Objection, nonresponsive.

10:08:48 4        Q.  What do you mean she lets them and then she

10:08:50 5    reneges?  What does that --

10:08:52 6        A.  Well, first she says they can, and then she

10:08:54 7    says they can't stay on her membership.  And then he

10:08:56 8    says, "Well, they can" -- he's going to go ahead and

10:08:58 9    let them say.

10:09:00 10       Q.  All right.  So it's your testimony --

10:09:01 11       A.  That's just what my kids told me.

10:09:02 12       Q.  -- that your kids said they can't stay; they

10:09:04 13   can stay; they can't stay, like that?

10:09:06 14           THE WITNESS:  Yeah, something like that.

10:09:07 15   And you know what?  I object to any further questions

10:09:11 16   involving the swimming pool incident.  If we can't move

10:09:13 17   on, then we're stuck.  Okay?

10:09:15 18           So, you know, as far as this thing, I

10:09:17 19   don't see the relevance of this.  All right?  It has

10:09:20 20   no -- it's irrelevant, immaterial, and has no bearing

10:09:23 21   on this case.  So move on or we're done.

10:09:26 22           MS. LIPPMAN:  I'm going to object to the

10:09:27 23   nonresponsive contents of Mr. McDuffie's --

10:09:29 24           THE WITNESS:  The swimming pool incident

10:09:29 25   is not --

10:09:30 1          MS. LIPPMAN:  -- comments.

10:09:31 2          THE WITNESS:  It's not relevant, and it's

10:09:32 3  not likely to affect the outcome whatsoever.

10:09:38 4          MS. LIPPMAN:  I again will object to his

10:09:38 5  nonresponsive comments.

10:09:40 6          THE WITNESS:  Well, it's irrelevant,

10:09:41 7  immaterial, and has no bearing on this case.

10:09:44 8          MR. BALLI:  Join in the objection.

10:09:46 9      Q.  All right.  When is the next incident you

10:09:47 10  had -- well, actually, let me strike that.  When you

10:09:48 11  went back to the swimming pool, did you speak with

10:09:52 12  Ms. Keese?

        13          THE WITNESS:  I'm not going to make any

10:09:53 14  more comments about the swimming pool incident.

10:09:55 15      Q.  Are you --

10:09:55 16          THE WITNESS:  I find it irrelevant.  I

10:09:57 17  object.  Irrelevant, immaterial, and has no bearing on

10:09:59 18  this case.

10:10:00 19          MS. LIPPMAN:  I'm going to object to the

10:10:00 20  nonresponsive comments.

10:10:02 21      Q.  Are you --

10:10:04 22          MR. BALLI:  Join in the objection.

10:10:05 23      Q.  Are you objecting to providing testimony

10:10:07 24  regarding what a party in this case said to you after

10:10:09 25  this incident?

10:10:13 1      A.   Rephrase the question.

10:10:14 2      Q.   I asked you what Ms. Keese said to you while

10:10:17 3   you were at the swimming pool.  Are you refusing to

10:10:19 4   answer a question that I asked you --

10:10:21 5      A.   No.  Ms. Keese didn't say anything.  She didn't

10:10:23 6   say anything to me.

10:10:24 7      Q.   And that's why I'm asking.  Did you speak with

10:10:25 8   Ms. Keese at the swimming pool?

10:10:26 9      A.   No, no.

10:10:27 10     Q.   Both the first time or the second time you were

10:10:30 11  there?  You said you were there, and then you went

10:10:33 12  home, then you went back to the pool?

10:10:34 13     A.   That's correct.

10:10:34 14     Q.   Okay.  On either of those two visits, did you

10:10:36 15  speak with Ms. Keese?

10:10:37 16     A.   Well, on the second visit, I asked her because

10:10:40 17  she was in front of him and a bunch of other people.  I

10:10:43 18  said, "Why don't you shoot the finger at me now?"

10:10:47 19              See, because she would always do it when

10:10:49 20  nobody else was looking.  She would always do it when

10:11:00 21  we're passing down the road.  Nobody else can see.

10:11:00 22              So I had her trapped in front of Wilson

10:11:00 23  and all the other people there, and I said, "Hey, why

10:11:01 24  don't you shoot the finger at me now?"

10:11:04 25     Q.   Okay.

10:11:04 1    A.  No response.

10:11:05 2    Q.  Anything else --

10:11:06 3    A.  And got no response.

10:11:07 4    Q.  Did you say anything else to her there on your

10:11:09 5    second visit to the swimming pool that day?

10:11:12 6    A.  I don't recall.  If I did, it was something

10:11:14 7    like, you know, "I'll see you in court," or something

10:11:16 8    to that effect.

10:11:20 9    Q.  Nothing else you can remember about --

10:11:22 10    A.  No.  And if you're trying to insinuate that

10:11:24 11    according to her last statement that she made that was

10:11:28 12    left to be a stale complaint by the district attorney,

10:11:31 13    that was totally false.

10:11:34 14            MS. LIPPMAN:  I'm going to object to the

10:11:34 15    nonresponsive comment by Mr. McDuffie.

10:11:38 16            THE WITNESS:  You can object all you want

10:11:39 17    to.

10:11:39 18            MR. BALLI:  Join in the objection.

10:11:40 19            THE WITNESS:  We'll tell the magistrate.

10:11:43 20    Q.  Is there anything else that you remember saying

10:11:45 21    to Ms. Keese that second --

10:11:46 22    A.  No, no.

10:11:47 23    Q.  You've got to let me finish my question because

10:11:48 24    it's to hard to read what she writes if we interrupt

10:11:51 25    each other.

10:11:51 1      A.  All right.  Go ahead.

10:11:52 2      Q.  Is there anything else that you remember saying

10:11:54 3  to Ms. Keese when you returned to the swimming pool

10:11:56 4  that day?

10:11:56 5      A.  No, nothing else.

10:12:07 6      Q.  All right.  When is the next time that you had

10:12:10 7  any sort of incident with Ms. Keese after the swimming

10:12:12 8  pool incident?

10:12:20 9      A.  I don't recall.

10:12:24 10     Q.  At this time, is there any other interaction

10:12:26 11 that you recall with Ms. Keese other than perhaps

10:12:29 12 passing on the roadway?

10:12:31 13     A.  Well, she -- yeah, well, just last evening, my

10:12:36 14 child was visiting a friend of his that lives behind

10:12:39 15 their house and a couple of houses down, and he

10:12:43 16 happened to go by their house.

10:12:46 17             And her and her husband -- Ms. Keese and

10:12:50 18 her husband were standing outside shouting profanities

10:12:53 19 and threatening my 9-year-old boy.  As a matter of

10:12:57 20 fact, Mr. Keese invited my 9-year-old son's other

10:13:01 21 9-year-old friend into his yard for a fight.

10:13:05 22             He said, "Come on over here.  I'll fight

10:13:08 23 you."  Pretty inappropriate for a 41-year-old man to

10:13:13 24 invite a 9-year-old child to a fight.  And then she

10:13:17 25 went and called the sheriff's department because of

10:13:20 1   this incident and had the sheriff's department come out

10:13:24 2   and take a report.

10:13:25 3       Q.  About what?

10:13:27 4       A.  About the kids, about trying to say that my

10:13:30 5   kids were down there on her property or something or

10:13:33 6   harassing her or something.  I don't know.  And they

10:13:35 7   weren't.

10:13:36 8       Q.  Okay.  Were you there?

10:13:37 9       A.  I wasn't there, but, you know, all the other

10:13:41 10  kids saw the incident and told me that, you know --

10:13:46 11  now, Charlie did admit to me that he had his bicycle

10:13:51 12  tire on the back of their driveway.

10:13:54 13          But be advised, the Nav. District owns 20

10:13:56 14  feet in.  So he wasn't on their property.  So this is

10:14:00 15  an erroneous complaint by them saying he's trespassing

10:14:03 16  on their property because that 20 feet belongs to the

10:14:06 17  Nav. District.

10:14:06 18          That's not private property.  But anyway,

10:14:10 19  this woman is a lunatic going and calling the cops

10:14:12 20  every two seconds for nothing.

10:14:18 21      Q.  When did that happen?

10:14:19 22      A.  You'll have to excuse my frustration here.

10:14:23 23  Okay?  But when you have a lunatic on your back, it

10:14:24 24  drives you nuts.

10:14:26 25      Q.  When did this happen?

10:14:28 1          A.   Yesterday last, yesterday evening --

2                    MRS. MCDUFFIE:   Saturday.

10:14:33 3                    THE WITNESS:   Oh, Saturday.   Excuse me.

10:14:34 4     Saturday.   If we don't take a break for a cup of

10:14:42 5     coffee, I'm going to go nuts.

10:14:44 6                    MS. LIPPMAN:   Okay.   Well, why don't we do

10:14:45 7     that.   Let's take about five, ten minutes.

10:14:48 8                    THE WITNESS:   I mean, I'll be happy to

10:14:49 9     answer your questions, and maybe I won't object to as

10:14:50 10    many if I could just, you know, settle down, you know,

10:14:53 11    from thinking about this woman, because this woman, you

10:14:58 12    know, is insane, and she -- she's demon possessed is

10:15:03 13    what she is.   Okay?

10:15:05 14                   MS. LIPPMAN:   All right.   Well, why don't

10:15:06 15    we take five, ten minutes, whatever you need, and we'll

10:15:08 16    get started back again.

10:15:10 17                   THE WITNESS:   Well, he's in league with

10:15:11 18    her, and God's judgement be on you in the name of

10:15:12 19    Jesus.

10:15:13 20                   MR. BALLI:   Objection, nonresponsive.

10:15:14 21    Move to strike.

22                    THE WITNESS:   You can object all you want.

23    I have the higher power on my side.

24                    (Brief recess)

10:33:44 25                   MS. LIPPMAN:   We're back on the record

10:33:46  1    after a short break.  Is everybody ready to proceed.

10:33:48  2        A.  Yeah.  Thanks, Joanna, for your indulgence.

10:33:51  3        Q.  Okay.  All right.  After the incident -- well,

10:33:54  4    let me strike that.  Were there any other incidents you

10:33:57  5    had with Ms. Keese other than the incidents you've

10:33:59  6    described on the record?

10:34:00  7        A.  No, not to my recollection.

10:34:09  8        Q.  You understand that in this lawsuit I represent

10:34:11  9    Deputy Salinas?

10:34:13 10        A.  Yes.

10:34:13 11        Q.  And you know who that is?

10:34:15 12        A.  Yes.

10:34:16 13        Q.  Other than -- well, let me strike that.  When

10:34:20 14    is the first time that you had any interaction with

10:34:20 15    Deputy Salinas?

10:34:22 16        A.  The morning after they held me in the tank, I

10:34:25 17    guess you would call it, at the detention center.  They

10:34:28 18    came out and got me at 9:30 at night and held me

10:34:38 19    without the benefit of being able to, you know, do

10:34:44 20    anything about it except stay there until the next

10:34:47 21    morning.  The next morning is when I saw Salinas.

10:34:51 22        Q.  All right.  Up until the incident, the arrest

10:34:54 23    that we're talking about today -- and that was in

10:34:55 24    January of 2001, correct?

10:34:58 25        A.  Yeah.

11:03:14 1     Q.  No one?

11:03:15 2     A.  No.

11:03:16 3     Q.  Okay.  When is the next time that you saw it

11:03:18 4  after seeing it fed at Ms. Jones'?

11:03:24 5     A.  I think it was the day of the incident, as I

11:03:27 6  remember.

11:03:28 7     Q.  Okay.  Did you --

11:03:29 8     A.  I might have seen it, you know, just traversing

11:03:33 9  through, you know.  As a matter of fact, I think I

11:03:38 10  remember seeing it just kind of transiting, you know,

11:03:40 11  in transit through the area a couple of times prior to

11:03:44 12  the incident.

11:03:45 13          But then, you know, the next close

11:03:47 14  encounter, if you want to call it that, was the day of

11:03:50 15  the incident.

11:03:51 16     Q.  Okay.  Was there anything else that you

11:03:52 17  remember happening with the dog or anything else you

11:03:54 18  remember about the dog up until the day of the

11:03:57 19  incident?

11:04:02 20     A.  Just it transiting, you know, through the yard

11:04:05 21  or the neighborhood or whatever.

11:04:08 22     Q.  Okay.  From the records I have, it looks like

11:04:09 23  the day of the shooting was December 15, 2000.  Does

11:04:12 24  that sound right to you?

11:04:14 25     A.  I think that's correct.

11:04:16  1      Q.  Okay.  And that's the next time that you

11:04:17  2  remember having any interaction with the dog or hearing

11:04:19  3  anything about the dog?

11:04:21  4      A.  Yeah.  And that was the last time.

11:04:27  5      Q.  Well, tell me what happened that morning.

11:04:30  6  First, you got up in the morning.  What did you do that

11:04:32  7  day?

11:04:33  8      A.  Well, I was -- I always get on the computer

11:04:36  9  pretty much first thing.  I get a cup of coffee and get

11:04:39 10  on the computer.

11:04:40 11      Q.  What were you doing on the computer?

11:04:42 12      A.  Checking e-mail, I think.  And my wife was

11:04:49 13  outside getting the kids off on the school bus, and I

11:04:57 14  heard them talking outside, and I heard the school bus

11:05:00 15  load up, and I heard it, you know, roar away like it

11:05:04 16  always does.

11:05:04 17          And then she came running in telling me

11:05:07 18  that that dog was out there bothering our dog.  And so

11:05:15 19  I went out there, and it looked like a confrontation

11:05:20 20  was going on between my rottweiler, which was tied with

11:05:23 21  a chain to the tree in the front yard on the southeast

11:05:29 22  corner of the house.

11:05:33 23          And I tried to go out there and get my dog

11:05:37 24  off the chain and get it in the house so that, you

11:05:42 25  know, it would be out of harm's way.  And I saw that

11:07:28 1   didn't want the thing to go and die somewhere and, you

11:07:32 2   know, nobody would be able to find it, and then

11:07:34 3   unbeknown to me it had bitten somebody days before or

11:07:37 4   the day before, you know, or whatever.  You know what

5   I'm saying?

11:07:40 6          And they wouldn't have the benefit of

11:07:41 7   knowing whether or not he had rabies or not and maybe

11:07:44 8   somebody would die of rabies.  I was not successful in

11:07:48 9   finding the dog, and so I gave it up.  And that's about

11:07:53 10  the end of the story on the incident of the day in

11:07:56 11  question.

11:08:04 12     Q.  I am not familiar with your house and how it's

11:08:07 13  set up or really that area at all.  Can I get you to

11:08:10 14  kind of get me a little diagram that will give me an

11:08:12 15  idea of where everything is?

11:08:14 16     A.  Sure.  Get you some directions.  Okay.

11:10:18 17     Q.  Why don't we mark this as an exhibit, and that

11:10:18 18  way we'll know what we're referring to.  Okay.  I've

11:10:25 19  marked as Exhibit No. 1 the drawing that you've just

11:10:28 20  made.

11:10:28 21     A.  Okay.

11:10:29 22     Q.  And I want to kind of talk through it a little

11:10:30 23  bit so that the court reporter will be able to reflect

11:10:33 24  what it is we've got here.

11:10:34 25          What you've drawn, I guess, in the center

11:05:45 1   that dog wasn't -- I don't know what mood that dog was

11:05:48 2   in that day, but it wasn't in a mood that it was going

11:05:51 3   to let me get close to my dog.

11:05:53 4           And so I said, "Well, I'm going to take my

11:05:57 5   little 410 shotgun out there with me just in case."  So

11:06:01 6   I went back in the house, and I grabbed my 410 shotgun

11:06:07 7   and one bird shot shell just, you know, as a

11:06:11 8   precaution.  And I went over again to try to get her

11:06:15 9   off her chain, and that dog turned on me, showed its

10   canines.

11:06:22 11          Looked like a dog you see that has rabies

11:06:24 12  on the movies.  And it kind of had me trapped between

11:06:30 13  it and my dog.  And so I stood up, and I looked towards

11:06:38 14  the big, like, 80-acre field that's right across the

11:06:41 15  street from me.  And if you could see where I was at, I

11:06:46 16  made certain a split second that there was no traffic,

11:06:49 17  no pedestrians, no vehicles, no nothing.

11:06:52 18          I lowered the gun at an angle about like

11:06:55 19  this and fired one shot, and unfortunately, it didn't

11:07:00 20  kill the dog.  It ran off hollering real loud.  And

11:07:05 21  that was the last I saw of it.  I went in and put the

11:07:07 22  gun away.  I went out and tried to find it so that if

11:07:12 23  it died somewhere, we would be able to obtain the head

11:07:20 24  for the Texas Department of Health to confirm or not

11:07:24 25  confirm the presence of rabies, because, you know, I

11:07:28  1    didn't want the thing to go and die somewhere and, you

11:07:32  2    know, nobody would be able to find it, and then

11:07:34  3    unbeknown to me it had bitten somebody days before or

11:07:37  4    the day before, you know, or whatever.  You know what

          5    I'm saying?

11:07:40  6               And they wouldn't have the benefit of

11:07:41  7    knowing whether or not he had rabies or not and maybe

11:07:44  8    somebody would die of rabies.  I was not successful in

11:07:48  9    finding the dog, and so I gave it up.  And that's about

11:07:53  10   the end of the story on the incident of the day in

11:07:56  11   question.

11:08:04  12        Q.  I am not familiar with your house and how it's

11:08:07  13   set up or really that area at all.  Can I get you to

11:08:10  14   kind of get me a little diagram that will give me an

11:08:12  15   idea of where everything is?

11:08:14  16        A.  Sure.  Get you some directions.  Okay.

11:10:18  17        Q.  Why don't we mark this as an exhibit, and that

11:10:18  18   way we'll know what we're referring to.  Okay.  I've

11:10:25  19   marked as Exhibit No. 1 the drawing that you've just

11:10:28  20   made.

11:10:28  21        A.  Okay.

11:10:29  22        Q.  And I want to kind of talk through it a little

11:10:30  23   bit so that the court reporter will be able to reflect

11:10:33  24   what it is we've got here.

11:10:34  25               What you've drawn, I guess, in the center

11:15:03 1   south-southeast; is that correct?

11:15:04 2       A.  That's correct.  The shot went that way.

11:15:26 3       Q.  Okay.  And where did you go to look for the

11:15:28 4   dog?

11:15:28 5       A.  Well, after I went back in and locked up my

11:15:32 6   dog, I came back, because the dog went down this

11:15:34 7   direction, so I walked down here.

11:15:36 8       Q.  Of course, the court reporter can't point this

11:15:38 9   direction.

11:15:39 10      A.  Oh, I'm sorry.  I walked out of the house and

11:15:40 11  walked down the street in a northerly direction for a

11:15:45 12  few hundred feet.  The dog had already gone out of

11:15:49 13  sight, and I couldn't locate it.

11:15:54 14          I wasn't aware what direction it had

11:15:56 15  turned.  I knew that it had started, you know, down

11:15:59 16  that way, down to the north, but evidently, it made a

11:16:06 17  turn, and I, you know, couldn't find the direction that

11:16:09 18  it had gone.  I couldn't locate it.

11:16:14 19      Q.  Okay.  When is the next thing that happened

11:16:15 20  that's related to this incident with the dog?

11:16:20 21      A.  As far as I'm concerned?

11:16:22 22      Q.  Yes.

11:16:24 23      A.  When they came out and arrested me.

11:16:26 24      Q.  Okay.  Up until the day of the arrest, you

11:16:29 25  didn't have any interaction with anyone about the dog?

11:16:31  1    A.   No.

11:16:33  2    Q.   Didn't know what ever happened to the dog?

11:16:35  3    A.   Well, I had heard a rumor that one of the

11:16:41  4    neighbors had found it, two neighbors, somebody that

11:16:49  5    lives in that house there, and then there's a flop

11:16:54  6    house across the street from there over here.  What I

11:16:59  7    call a flop house is a $200 a month apartment complex

11:17:04  8    where they have cars up on blocks.  Anyway, you know, a

11:17:09  9    woman from there.

11:17:11 10         They found the dog -- the rumor was, they

11:17:14 11    had found the dog under somebody's house and had called

11:17:21 12    one of the guys that worked for the Navigation District

11:17:24 13    named Vasquez.  And I had heard that they had taken it

11:17:37 14    to the vet, I guess, you know, to get checked and see,

11:17:37 15    you know, kind of like what I wanted to do, you know,

11:17:38 16    see if it had rabies or whatever.

11:17:40 17         That was the next thing I had heard about

11:17:42 18    it, you know.  And then after that, the next thing I

11:17:44 19    heard was a knock on the door, cops picking me up.

11:17:47 20    Q.   You said you had heard a rumor.  Who did you

11:17:50 21    hear that from?

11:17:51 22    A.   I can't recall.  I don't remember who it was.

11:17:56 23    Q.   All right.  After you shot the dog, who did you

11:17:58 24    call to let them know that you had done so?

11:18:02 25    A.   I didn't call anybody.

11:18:06 1    Q.  Okay.  After you looked -- you said you walked

11:18:08 2   a couple hundred yards looking for it?

11:18:11 3    A.  Yeah.  I kind of scoured this whole area here.

11:18:13 4    Q.  After you did that, you didn't do anything?

11:18:15 5   You heard the rumors, and the next thing was the

11:18:17 6   arrest?

11:18:18 7    A.  See, I -- yeah.  I wasn't too concerned,

11:18:21 8   because as I walked back to my house after I had

11:18:24 9   started looking for that dog, I saw some other people

11:18:27 10  looking for it.

11:18:28 11   Q.  How did they know to look for it?

11:18:30 12   A.  Well, I guess they heard it holler, because it

11:18:33 13  really was hollering.  After I had shot it, it was

11:18:37 14  running and hollering really loud, and it made quite a

11:18:41 15  ruckus.

11:18:42 16   Q.  All right.  So the dog made a lot of noise?

11:18:46 17   A.  I figured somebody was going to find it, you

11:18:49 18  know.  I just stayed out of it.

11:18:52 19   Q.  Okay.  I guess I don't understand.  You're

11:18:54 20  worried the dog has rabies, right?

11:18:57 21   A.  Not worried that it has rabies.  I'm worried,

11:19:01 22  you know, that if it goes somewhere and dies, you

11:19:04 23  know -- I make my initial search for it, you know, so

11:19:07 24  that I can, you know -- you know, if it had laid down

11:19:13 25  somewhere and died, then I could get it and have the

11:19:16  1    head sent to Austin.

11:19:18  2              But I guess my assumption was that it

11:19:22  3    wasn't a fatal shot and maybe just a skin nick, you

11:19:25  4    know, or whatever.  And that's why I kind of gave up on

11:19:28  5    it, because it was just hollering and running.  There

11:19:30  6    was no blood trail or anything.

11:19:32  7        Q.  Okay.  You didn't call the Navigation District,

11:19:34  8    though, right?

11:19:35  9        A.  No, I didn't.  There was no need to, because I

11:19:37 10    had never gotten any response from them before.  Why

11:19:39 11    should I call them -- why should I call them then?

11:19:43 12              We had called them and complained, you

11:19:43 13    know -- I mean, she had called, not me.  She had called

11:19:46 14    them and complained, and I was privy to the information

11:19:49 15    that she had called and complained about it on several

11:19:51 16    occasions.  And I said, "Well, hell, why are they going

11:19:54 17    to listen to me if they ain't going to listen to her?"

11:19:57 18              MR. BALLI:  Objection, nonresponsive.

11:19:58 19        Q.  And you didn't think it was important that

11:19:59 20    somebody should know that a shot dog was walking around

11:20:03 21    the neighborhood?

11:20:03 22        A.  Well, if you want to determine it that way,

11:20:07 23    then I'll accept that.

11:20:08 24        Q.  You'd agree?

11:20:09 25        A.  Yeah.

11:46:18 1    cuffs off.  I said, "Gee whiz, look at that," you know,

11:46:22 2    to make a point, you know what I mean, to draw

11:46:24 3    attention.

11:46:25 4        Q.  Who did you show?

11:46:27 5        A.  Everybody that was in the immediate area.

11:46:29 6        Q.  Who?

11:46:30 7        A.  Whoever the guy was that was the jailer,

11:46:35 8    whoever -- you know, there was another person there.

11:46:38 9    There was another woman that was walking through in a

11:46:42 10   uniform.

11:46:42 11            And I just hollered, not real loud, but I

11:46:45 12   mean, you know, I just brought it to light, brought it

11:46:48 13   to the attention and showed it around so that, you

11:46:51 14   know --

11:46:52 15       Q.  All right.  What was there to see?

11:46:57 16       A.  Really deep abrasions.

11:47:01 17       Q.  When you say "abrasions" --

11:47:03 18       A.  Purple.  Well, let's call them -- instead of

11:47:07 19   abrasions, let's call them indentations.  Deep purple

11:47:10 20   indentations that didn't go away, incidentally, for

11:47:15 21   several hours.

11:47:16 22            The indentations stayed on my wrist and

11:47:19 23   did not go away until I had been sitting in there

11:47:24 24   for -- well, damn near the next morning.  That's how

11:47:29 25   tight they were.  I swear to you.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOE B. MCDUFFIE            ) (
KATHERINE MCDUFFIE         ) (
         Plaintiffs        ) (
                           ) (
VS.                        ) (    CIVIL ACTION NO. B-01-143
                           ) (
GUILLERMO SALINAS, JR.,    ) (
HECTOR GARZA and JENNIFER  ) (
KEESE                      ) (
         Defendants        ) (

_____

ORAL DEPOSITION OF
JENNIFER KEESE
JANUARY 15, 2002



_____

ORAL DEPOSITION OF JENNIFER KEESE, produced as

a witness at the instance of the DEFENDANTS GUILLERMO

SALINAS, JR., HECTOR GARZA, AND THE WILLACY COUNTY

NAVIGATIONAL DISTRICT, taken in the above styled and

numbered cause on JANUARY 15, 2002, reported by DONNA

McCOWN, Certified Court Reporter No. 6625, in and for

the State of Texas, at the offices of Adams & Graham,

L.L.P., 222 East Van Buren, West Tower, Harlingen,

Texas, pursuant to the Federal Rules of Civil Procedure.

EXHIBIT

2
_____

09:25:09 1    Q.  All right.  Are you directly behind it?

09:25:12 2    A.  Maybe two houses behind it.

09:25:18 3    Q.  All right.  Tell me what you remember

09:25:20 4  happening.

09:25:21 5    A.  By the time I got, say, near Mr. Wilson's

09:25:26 6  house --

09:25:27 7    Q.  And I'm afraid I don't know where Mr. Wilson

09:25:29 8  lives.

09:25:34 9    A.  Right about here.

09:25:35 10    Q.  All right.  So Mr. Wilson lives on South Shore?

09:25:38 11    A.  Yes.

09:25:39 12    Q.  About how many houses from the McDuffies?

09:25:45 13    A.  On the opposite side of the street, I would say

09:25:47 14  four, maybe five.

09:26:02 15    Q.  Okay.  And what happened as you were about at

09:26:05 16  Mr. Wilson's house?

09:26:06 17    A.  I saw the McDuffie children and the other

09:26:08 18  children that are at that bus stop getting on, and we

09:26:11 19  proceeded.

09:26:12 20         I wasn't close enough where I had to come

09:26:14 21  to a stop behind the school bus.  And as the school bus

09:26:18 22  turned off its flashing lights and started moving down

09:26:21 23  the street, we heard a gunshot.

09:26:24 24    Q.  All right.  So you saw the McDuffie kids and

09:26:27 25  some other kids get on the school bus?

09:26:29 1    A.  Yes.

09:26:29 2    Q.  And then the bus started to go again, correct?

09:26:32 3    A.  Yes.

09:26:33 4    Q.  And when you heard the gunshot, where was the

09:26:36 5  bus?

09:26:38 6    A.  Maybe three to four houses down from the

09:26:40 7  McDuffies before the mandatory right turn.

09:26:44 8    Q.  So about three to four houses?

09:26:46 9    A.  Uh-huh, yes.

09:26:49 10    Q.  And where were you?

09:26:52 11    A.  By this time, I was -- I don't know the name of

09:26:57 12  the person's house, but they're two houses from -- on

09:27:03 13  the other side of the street from the bus stop.

09:27:12 14         I know the house on the corner is what

09:27:15 15  everybody in Port Mansfield calls the Baldridge house.

09:27:19 16  I was in front of the house next to that one.

09:27:24 17    Q.  So when you first started going, you said you

09:27:26 18  were about two houses behind the bus.  At the time that

09:27:28 19  you hear the gunshot, you're now more like six or eight

09:27:33 20  houses?

09:27:33 21    A.  Well, I slowed down because the bus was

09:27:35 22  stopped.  So I slowed down.

09:27:44 23    Q.  Okay.  All right.  So the bus is three or four

09:27:46 24  houses past the McDuffie house?

09:27:48 25    A.  Uh-huh.

09:27:48 1      Q.  And you're two or three houses before the
09:27:51 2   McDuffies?
09:27:52 3      A.  Yes.
09:27:57 4      Q.  All right.  So you hear a gunshot?
09:27:59 5      A.  Yes.
09:27:59 6      Q.  Are you familiar with guns to have an opinion
09:28:09 7   as to what type of weapon you heard?
09:28:09 8      A.  No.
09:28:09 9      Q.  Was there any doubt in your mind that what you
09:28:09 10  heard was a gunshot?
09:28:10 11     A.  No.
09:28:12 12     Q.  All right.  When you heard the gunshot, what
09:28:14 13  did you see?
09:28:16 14     A.  The dog in the middle of the street jumped and
09:28:21 15  turned and barked towards the McDuffies' house.
09:28:38 16     Q.  Had you noticed the dog at any time before the
09:28:40 17  gunshot?
09:28:41 18     A.  No.
09:28:42 19     Q.  Do you know when it is the dog moved into the
09:28:45 20  street?  Because obviously, if the bus was coming down
09:28:47 21  that street, it wasn't there at that moment.
09:28:49 22          So do you have any idea where the dog came
09:28:52 23  from that it was now in the street?
09:28:53 24     A.  No.
09:28:55 25     Q.  The first time you noticed the dog it was in

the street behind the school bus and in front of you?

A.   Yes.

Q.   And was the dog directly in front of the McDuffie house?

A.   Yes.

Q.   Okay.  What else did you see besides the dog?  Did you see anyone from the McDuffie household or anyone at their house?

A.   By the time I got up towards -- closer to the bus stop by Mr. McDuffie's house, Mr. McDuffie was just turning to go into his house.

Q.   Did you see Mrs. McDuffie at all?

A.   No.

Q.   Did you see anything in Mr. McDuffie's hands?

A.   No.

Q.   You don't know whether or not he had a weapon or what kind of weapon he may have had?

A.   His hands were -- his arms were in front of him and his back to me, so no, I did not.

Q.   Okay.  What did you do after you saw Mr. McDuffie turning and going toward the house?

A.   Instead of going straight to Ms. Ficklen's shed, we -- the dog ran down towards Fox Drive, which I'm not sure if this street right here is Fox Drive, but I know this one is.

09:30:12 1          We followed the dog to make sure it was

09:30:14 2    okay, and he ran under Mr. and Mrs. Creegan's house.

09:30:19 3    We didn't see any apparent wounds.  We did see some

09:30:23 4    specks which could have been blood.  We did not get out

09:30:26 5    of my truck.

09:30:28 6          Q.  Okay.  So you saw the dog.  Was it running?

09:30:30 7    Walking?

09:30:31 8          A.  Running.

09:30:31 9          Q.  And it ran past the area where the bus stop was

09:30:34 10   and up a street that comes out of South Shore, correct?

09:30:39 11         A.  Yes.

09:30:39 12         Q.  And then ran under a house?

09:30:41 13         A.  Yes.  We tried to call the dog, but he was

09:30:43 14   shaking and scared and wouldn't come to us.

09:30:47 15         Q.  All right.  And whose house did you say he ran

09:30:49 16   under?

09:30:50 17         A.  Barbara and Danny Creegan's.

09:30:51 18         Q.  Spell their last name for me.

09:30:53 19         A.  C-R-E-E-G-A-N.

09:30:57 20         Q.  Okay.  All right.  What else did you do after

09:30:58 21   that?

09:30:59 22         A.  I went home, and I called the sheriff's

09:31:01 23   department about a dog being shot.

09:31:15 24         Q.  All right.  Do you know who you talked to when

09:31:17 25   you called the sheriff's department?

09:31:19  1    A.  I spoke to a woman.

09:31:21  2    Q.  All right.  And what did they tell you?

09:31:22  3    A.  She would send a deputy out.

09:31:34  4    Q.  All right.  Did you ask for any particular

09:31:35  5  deputy to come out?

09:31:36  6    A.  No, I did not.

09:31:38  7    Q.  All right.  Did you do anything else other than

09:31:42  8  seeing where the dog had run under and then going back

09:31:44  9  to your home and calling the sheriff's department?

09:31:46 10    A.  No.

09:31:48 11    Q.  All right.  Before you called the sheriff's

09:31:49 12  department, did you go on and do whatever errands it

09:31:53 13  was that y'all were on your way to do, or did you just

09:31:55 14  go home?

09:31:55 15    A.  I just went home.

09:31:56 16    Q.  Okay.  And what did you do with your friend

09:31:59 17  Ms. Ficklen?

09:32:00 18    A.  I brought her home.

09:32:01 19    Q.  All right.  Was she with you when you made your

09:32:03 20  call to the sheriff's department, or did you take her

09:32:04 21  home first?

09:32:05 22    A.  I took her home first.

09:32:11 23    Q.  Okay.  And then what did you do after you made

09:32:13 24  your phone call?

09:32:15 25    A.  Normal daily routine.

57

09:32:17  1     Q.   Okay.   You had left your information for the

09:32:19  2  sheriff's department?

09:32:20  3     A.   Yes.

09:32:21  4     Q.   And then you weren't supposed to be waiting for

09:32:24  5  them or anything like that, as far as you knew?

09:32:26  6     A.   No.

09:32:26  7     Q.   What's the next thing that you heard or did or

09:32:28  8  saw that had to do with this dog?

09:32:34  9     A.   When either Sue or Frank -- Sue Nelson or Frank

09:32:41 10  Vasquez had -- I saw the District truck, and it had the

09:32:44 11  dog in it taking him in to the vet.

09:32:46 12     Q.   When was that?

09:32:48 13     A.   Not too -- maybe about an hour, hour and a

09:32:51 14  half.   I'm not sure on the time frame.

09:32:55 15     Q.   So you saw one of them or both of them, Sue and

09:32:59 16  Frank?

09:33:01 17     A.   It was more than likely Frank, but sometimes

09:33:03 18  Sue will drive a vehicle also when she's working.

09:33:06 19     Q.   All right.   Did you actually talk to anyone

09:33:08 20  while they were driving, or it's just that you saw the

09:33:09 21  vehicle?

09:33:10 22     A.   I just saw the vehicle.

09:33:12 23     Q.   And you saw that the dog was in it?

09:33:15 24     A.   Yes.

09:33:16 25     Q.   But you didn't talk to anyone about that at

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

09:35:08 1    Q.   What kind of injuries he had?

09:35:10 2    A.   No.

09:35:11 3    Q.   Any idea what type of weapon was used against

09:35:13 4    him based on his injuries?

09:35:15 5    A.   No.

09:35:16 6    Q.   Any idea of who treated the dog?

09:35:18 7    A.   Dr. Garcia.

09:35:19 8    Q.   He's the local vet?

09:35:20 9    A.   DMV in Raymondville, yes.  I guess DMV.

09:35:29 10   Q.   All right.  When is the next time you heard or

09:35:30 11   did anything that had to do with the dog after you

09:35:32 12   heard from Ms. Jones?

09:35:34 13   A.   When I went and signed the report.

09:35:38 14   Q.   All right.  So tell me what happened.  You went

09:35:40 15   to Raymondville?

09:35:40 16   A.   To the sheriff's department, and I -- Guillermo

09:35:48 17   Salinas -- I believe he's the investigator -- had typed

09:35:50 18   up the report.  And I went in and signed it in front of

09:35:53 19   the judge and in front of Ms. Fambrough.

09:35:56 20   Q.   Okay.  So tell me what happened.  Had you

09:35:58 21   talked to anybody about the fact that you were coming

09:35:59 22   before you showed up?

09:36:00 23   A.   No.

09:36:01 24   Q.   All right.  So you came to the sheriff's

09:36:03 25   office.  And did you know who you were supposed to talk

09:36:06  1    to when you came to the sheriff's office?

09:36:08  2        A.  No.

09:36:09  3        Q.  All right.  What happened when you got there?

09:36:10  4    Was there someone at the front desk that you talked to?

09:36:14  5        A.  There's a woman named Gloria that sits at the

09:36:14  6    front desk.

09:36:15  7        Q.  And did you know Gloria from something?

09:36:17  8        A.  Not prior, no.

09:36:19  9        Q.  Okay.  So what did you tell Gloria?

09:36:21 10        A.  That -- I told her my name, and I stated why I

09:36:24 11    was there and that I needed to sign a report.  And she

09:36:27 12    went and got Mr. Salinas.

09:36:30 13             And I went into his office and signed the

09:36:32 14    report, and he took me to Judge Solis' office right

09:36:35 15    down the hall to swear.

09:36:38 16        Q.  All right.  So when you were referred to Deputy

09:36:42 17    Salinas, was this someone that you knew?

09:36:43 18        A.  No.

09:36:43 19        Q.  Had you ever met Deputy Salinas before?

09:36:46 20        A.  No.

09:36:46 21        Q.  Ever had any interaction with Deputy Salinas?

09:36:48 22        A.  No.

09:36:48 23        Q.  Would you have known Deputy Salinas if he had

09:36:51 24    just walked in off the street?

09:36:52 25        A.  No.

62

09:36:57 1    Q.  He's not someone you specifically requested

09:36:59 2  when you came to the sheriff's department?

09:37:01 3    A.  No.

09:37:02 4    Q.  All right.  So when you came to Deputy Salinas,

09:37:04 5  you told him what you had seen, correct?

09:37:06 6    A.  Correct.

09:37:06 7    Q.  And then he typed it onto the report for you?

09:37:08 8    A.  Uh-huh, yes.

09:37:10 9    Q.  And then you read it?

09:37:11 10    A.  Yes.

09:37:11 11    Q.  And you didn't have any changes to it?

09:37:13 12    A.  No.

09:37:14 13    Q.  And you understood that if you felt like there

09:37:16 14  was anything that was inaccurate that you had an

09:37:17 15  opportunity to make those changes?

09:37:19 16    A.  Yes.

09:37:20 17    Q.  And Deputy Salinas didn't try to influence you

09:37:24 18  or change what you remembered when he typed the report?

09:37:26 19    A.  No.

09:37:27 20    Q.  And then after you read it, he took you in

09:37:29 21  front of JP Solis?

09:37:31 22    A.  Yes.

09:37:31 23    Q.  And did you have any personal relationship with

09:37:34 24  the justice of the peace?

09:37:36 25    A.  No.

09:37:36 1      Q.   Did you know him from anything prior to this

09:37:39 2   incident?

09:37:39 3      A.   No.

09:37:39 4      Q.   Had you ever been in front of him before?

09:37:41 5      A.   No.

09:37:42 6      Q.   Ever had any kind of interpersonal relationship

09:37:44 7   with JP Solis?

09:37:46 8      A.   No.

09:38:07 9      Q.   The report that Deputy Salinas prepared after

09:38:15 10  speaking with you, is that what I'm showing you here?

09:38:17 11  Does that appear to be a copy of what you --

09:38:20 12     A.   Yes.

09:38:21 13     Q.   -- signed?

09:38:21 14     A.   Yes.

09:38:22 15     Q.   I'm going to mark it as Exhibit 1, and that is

09:38:25 16  your signature on Exhibit 1?

09:38:27 17     A.   Yes.

09:38:37 18     Q.   All right.  When you went in to Justice of the

09:38:40 19  Peace Solis, did you also have this document, or was

09:38:43 20  that prepared at another time?  Do you know?

09:38:45 21     A.   That was prepared at another time.

09:38:46 22     Q.   Okay.  So this is your first visit, this

09:38:50 23  Exhibit 1, and it was prepared December 20th, correct?

09:38:53 24     A.   Yes.

09:38:54 25     Q.   And you went in front of JP Solis and signed it

09:38:57 1  in front of him?

09:38:58 2      A.  In front of Rosie -- Josie Fambrough, the

09:39:02 3  notary public.

09:39:03 4      Q.  All right.  So this -- Exhibit 1 is not one

09:39:05 5  that you signed in front of the justice of the peace;

09:39:08 6  is that right?

09:39:08 7      A.  No.

09:39:08 8      Q.  And did you go in front of the justice of the

09:39:10 9  peace on that day?

09:39:13 10     A.  I believe I had to to be sworn in for my

09:39:16 11 signature.

09:39:16 12     Q.  Okay.  But beyond that, did you -- did the

09:39:20 13 merits of what the complaint was, were those discussed

09:39:22 14 at all when you went in front of the JP to sign that?

09:39:24 15     A.  No.

09:39:25 16     Q.  And as far as you knew, you just signed that,

09:39:27 17 and it was notarized by Ms. Fambrough?

09:39:30 18     A.  Yes.

09:39:32 19     Q.  Okay.  What else did you do while you were

09:39:34 20 there on December 20th?

09:39:36 21     A.  That's it.

09:39:37 22     Q.  Okay.  What did Deputy Salinas tell you about

09:39:40 23 what the process was or what was going to happen?

09:39:43 24     A.  I don't think he did say anything about the

09:39:45 25 process or what would happen.

09:39:47 1     Q.  Okay.  So what was your understanding of what

09:39:49 2   was going to happen after you signed that?

09:39:51 3     A.  I really didn't know.

09:39:53 4     Q.  All right.  So when you left there, did you

09:39:55 5   understand there was anything else you needed to do or

09:39:59 6   that was going to happen?

09:39:59 7     A.  No.

09:40:00 8     Q.  What's the next time that you saw or heard or

09:40:03 9   did anything that related to the dog?

09:40:07 10    A.  I believe it was Josie Fambrough who called me

09:40:16 11  to say I needed to come in and sign another form in

09:40:16 12  front of the judge, that they were issuing some -- a

09:40:18 13  warrant.

09:40:26 14    Q.  All right.  It was Josie Fambrough who called

09:40:29 15  you?

09:40:29 16    A.  I believe so.

09:40:30 17    Q.  Not Deputy Salinas?

09:40:31 18    A.  No.

09:40:32 19    Q.  Not Deputy Garza?

09:40:33 20    A.  No.

09:40:35 21    Q.  Okay.  When she called you, do you remember

09:40:36 22  when that was?

09:40:37 23    A.  I really don't.

09:40:39 24    Q.  Is it your belief it was probably after the New

09:40:41 25  Year's?

09:40:42  1      A.  More than likely after the New Year's.

09:40:45  2      Q.  Okay.  When you came in, who did you talk to?

09:40:47  3      A.  I went straight to Josie's office.

09:40:58  4      Q.  Okay.  What happened when you got to her

09:41:00  5  office?

09:41:00  6      A.  She went and told the judge that I was there,

09:41:03  7  and I waited for the judge.

09:41:15  8      Q.  All right.  And then what happened?

09:41:18  9      A.  The judge came in, and he swore me in to

09:41:22 10  whatever -- I'm not sure what the term is, but then I

09:41:24 11  signed the paper, and I left.

09:41:31 12      Q.  Was Deputy Salinas there when this occurred?

09:41:34 13      A.  No.

09:41:38 14      Q.  I'm going to show you what's been marked as

09:41:41 15  Exhibit 2.  Is this the document that you remember or

09:41:49 16  at least one of the documents you remember signing when

09:41:51 17  you came in that second visit?

09:41:53 18      A.  Yes.

09:41:53 19      Q.  Do you know who prepared that document?

09:41:56 20      A.  I believe Judge Solis did.

09:41:58 21      Q.  All right.  No reason that you have at this

09:42:00 22  point to believe that Deputy Salinas prepared that?

09:42:03 23      A.  No.

09:42:10 24      Q.  On the top of the paper, it talks about the

09:42:13 25  complaint, and it gives a date of the 13th of January.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

JOE B. MCDUFFIE and       §
KATHERINE MCDUFFIE       §
     Plaintiffs,       §
      §
**vs.**       §
      §       **Civil Action No. B-01-143**
      §
GUILLERMO SALINAS, JR.,       §
HECTOR GARZA, JENNIFER       §
KEESE, WILLACY COUNTY       §
SHERIFF'S DEPARTMENT, and       §
WILLACY COUNTY NAVIGATION       §
DISTRICT       §
     Defendants       §

---

## AFFIDAVIT OF CUSTODIAN OF RECORDS

---

THE STATE OF TEXAS      §

COUNTY OF WILLACY      §


     BEFORE ME, the undersigned Notary Public, on this day personally appeared _GLORIA G GARZA_ and being first by me duly sworn according to law, upon oath states:

     "My name is _GLORIA G GARZA_ , and I am over the age of twenty-one years and competent to make this Affidavit. I have personal knowledge of the facts and statements contained in this Affidavit, and they are true and correct.

     "I am a custodian of records for the Willacy County Sheriff's Department, and in such position, I am the custodian of the Sheriff Department records pertaining to the activities of the Department and the official activities of its employees. Attached hereto are copies of records from the files of the Willacy County Sheriff's

Affidavit of Custodian of Records

**EXHIBIT**

**3**

Department. These records are kept by the Department in the regular course of the activities of the Department. In the regular course of those activities, an employee or representative with personal knowledge of the act or event recorded makes the memorandum, record, statement or report, or transmits information thereof to be included in such memorandum, record, statement or report to the person actually making the entry; and the memorandum, record, statement or report was made at or near the time of the act or event or reasonably soon thereafter.

The records attached hereto are exact duplicates of the originals on file in the Department, and it is a rule of the Department not to permit the originals to be removed from the files kept in the regular course of the activities of the Willacy County Sheriff's Department."

Further, Affiant sayeth not.

_____
Custodian of Records, Willacy County, Texas

SUBSCRIBED AND SWORN TO BEFORE ME on _____, 2002, to certify which witness my hand and seal of office.

DAVID MARTINEZ
MY COMMISSION EXPIRES
July 27, 2002

_____
Notary Public in and for
The State of Texas

Affidavit of Custodian of Records                                    Page 2

# OFFENSE REPORT

### Deadly Conduct/Cruelty to Animals
Classification

NO. 00-0898

| 1 COMPLAINANTS NAME (Firm name of business) | | | 2 AGE | DESCENT | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|---|---|
| Jennifer Keese | | | 34 | White | F | 03/28/66 | (956) |
| 4 COMPLAINANT'S ADDRESS | | 5 CITY | | | | | 6 PHONE (Residence) |
| 123 Beach Street | | Port Mansfield, Texas | | | | | (956) 944-2247 |

| 7 COMPLAINANTS BUSINESS, EMPLOYMENT OR SCHOOL | 8 OBJECT OF ATTACK (Burglary, theft, assault, etc.) |
|---|---|
| Pelican's Bar and Grill | See Above Classification |
| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING (Residence, store, bank, etc.) |
| | Roadway (Public) |

| 11 REPORTED BY | PHONE | 12 REPORTED TO |
|---|---|---|
| Jennifer Keese | 944-2247 | Willacy County Sheriff's Department |
| 13 DAY, DATE AND TIME OF OFFENSE | | 14 DAY DATE AND TIME OF REPORT |
| Friday  12-15-00  Approx. 8:00 am | | Friday  12-15-00  9:30 am |
| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED (in person, phone, on view, other) |
| None | No | In Person |

17 M/O (How done-force used-at what point-with what tool or weapon-other acts or trade marks)
Suspect shot dog that was walking on the road in front of suspects residence with a firearm. (Upper back wound).

17A EXACT WORDS USED BY OFFENDER
Unknown

8 VEHICLE INVOLVED IN OFFENSE (Year-color-make-model-auto license no.-year-state)     Complainant's ☐  Suspect's ☐
None

19 DIRECTION OF FLIGHT STREET OR ROAD  ☐N ☐E ☐S ☐W  ☐AUTO ☐FOOT  20 WILL COMPLAINANT PROSECUTE?
☒LINK ☐OTHER    No

21 NAME AND ADDRESS OF SUSPECT(S) OR AGE DESCENT SEX DESCRIPTION
1 Joe McDuffy White, Male 303 South Shore Drive Portmansfield Texas
2 Unknown

22 CIRCLE IF SUSPECT IS
Employee-Relative-Acquaintance

| 23 WITNESSES NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN |
|---|---|---|---|---|---|
| 1 Donna T. Flickland | | | 944-2369 | | |
| 2 | | | | | |

24 NARRATIVE (Write in any available details not covered above)

ON FRIDAY, DECEMBER 15, 2000, I DEPUTY NICOLLS WAS ADVISED TO CALL COMPLAINANT, IN REFERENCE TO A STRAY DOG THAT HAD BEEN SHOT. UPON SPEAKING WITH COMPLAINANT SHE ADVISED THAT ABOVE NAMED SUSPECT SHOT A STRAY DOG AND THAT THE DOG WAS STILL ALIVE. COMPLAINANT ADVISED THAT SHE SAW THE PERSON WHO DID IT. COMPLAINANT ADVISED THAT SHE AND HER FRIEND DONNA T. FLICKLAND FOLLOWED THE DOG WHICH RAN TOWARD A RESIDENCE WHO IS OWNED BY DENNY CREAGEN. I REPORTED THE INCIDENT AND ASST. SUPERINTENDENT OF THE NAVIGATION DISTRICT FRANK VASQUEZ PICK UP THE DOG AND TOOK HIM TO DR. PICKARD'S IN RAYMONDVILLE.

RECEIVED MAR 13 2001 CO & DIST ATTORNEY

| 25 INVESTIGATING OFFICER(S) | 26 REPORT MADE BY Guillermo Salinas Jr. | DATE 121500 |
|---|---|---|

27 CASE FILED  Yes ☒  No ☐   ☐ Cleared by arrest   28 THIS CASE IS  Unfounded ☐ Inactive ☐ Other ☐   29 APPROVED BY Guillermo Salinas Jr.

**WILLACY COUNTY SHERIFF'S DEPARTMENT**
**ARREST / BOOKING REPORT**

BOOKING DATE: 1-18-2001
BOOKING TIME: 9:17 AM/PM

INMATE NUMBER: 14592
CASE NUMBER:

### PERSONAL INFORMATION

| LAST NAME | FIRST NAME | MIDDLE NAME | ALIAS |
|---|---|---|---|
| McDuffie | Joe | Bruce | |

ADDRESS: 303 S. Shore Dr.    APT NO: —    CITY: Port Mansfield    STATE: TX

| AGE | DATE OF BIRTH | PLACE OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | HAIR | EYES | COMPLEXION |
|---|---|---|---|---|---|---|---|---|---|
| | 3-02-50 | San Antonio TX | M | W | 6'1 | 230 | Bld | Hzl | Light |

OCCUPATION: Pilot    EMPLOYER ADDRESS:

| DRIVER'S LICENSE NO | STATE | OPERATOR | COMMERCIAL | CHAUFFEUR | SOCIAL SECURITY NO. |
|---|---|---|---|---|---|
| 06059020 | TX | [X] | [ ] | [ ] | 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 |

HOME PHONE NUMBER: 944-2777    BUSINESS PHONE NUMBER:    OTHER:    MARITAL STATUS: Married

CITIZEN OF U.S. [X] YES [ ] NO    LEGALLY IN U.S. [X] YES [ ] NO    NATIONALITY: US

| [X] RIGHT [ ] LEFT | SCAR — MARK — TATTOO  Bicept — Ginger | [ ] RIGHT [ ] LEFT | SCAR — MARK — TATTOO |
| [ ] RIGHT [ ] LEFT | SCAR — MARK — TATTOO | [ ] RIGHT [ ] LEFT | SCAR — MARK — TATTOO |

REMARKS:

### ARREST / CHARGES

| CHARGE | CODE | BOND AMT | MO CO DOCKET NO | AUTH. FOR ARREST |
|---|---|---|---|---|
| | | | | [ ] ON SIGHT |
| CHARGE | CODE | BOND AMT | MO CO DOCKET NO | [X] WARRANT |
| CHARGE | CODE | BOND | | [ ] CAPIAS |
| | | | | [ ] CAP. PRO FINE |
| LOCATION OF ARREST | TIME OF ARREST | DATE OF ARREST | | [ ] COMMITMENT |
| ARRESTEE INFORMED | MEDICAL AID | EXTENT OF ILLNESS OR INJURY | | [ ] FUGITIVE WRT. |
| ARRESTING OFFICER | DELIVERING OFFICER | RECEIVING OFFICER | | [ ] EXEC. ORDER |
| LOCATION OF ARRESTEE'S VEHICLE | | | | [ ] OTHER |
| NEAREST RELATIVE | ADDRESS 303 S Shore | PHONE 944- | | [ ] OTHER |

### HOLD

| HOLD FOR | AGENCY | CHARGE | WARRANT NUMBER | OFFICER |
|---|---|---|---|---|
| HOLD FOR | AGENCY | CHARGE | WARRANT NUMBER | OFFICER |

### DETENTION

| INMATE CLASSIFICATION | CELL ASSIGNMENTS | H + 2 | | |
|---|---|---|---|---|

SEARCHED BY: Maldonado    FINGERPRINTED: [X] YES [ ] NO    PHOTOGRAPHED: [ ] YES [ ] NO

RECORD CHECK: [X] NCIC WANTED  [X] TCIC WANTED  [X] CCH (HISTORY)    SUPERVISOR: Norma    THUMB PRINT

PHONE CALL:    PERSON CALLED:    PHONE NO.:

[ ] DRUNK  [X] NORMAL  [ ] COMBATIVE  [ ] UNCONSCIOUS  [ ] BELLIGERANT  [ ] OTHER

| BOOKING OFFICER | BADGE 633 | SHIFT 7-3 | SUPERVISOR Sgt Keener |
|---|---|---|---|

| TRN | | | DPS NO (SID) | | FBI NO | | CONTRIBUTOR ORI | | LEAVE BLANK |
|---|---|---|---|---|---|---|---|---|---|

**NAME (LAST, FIRST, MIDDLE)** Medrafie, Joe, Brace

**DATE OF BIRTH** 03-02-50

**PLACE OF BIRTH** S.A.

| SEX | RACE | ETH | HGT. | WGT | EYES | HAIR | SCARS, MARKS, TATTOOS, AMPUTATIONS | FPC |
|---|---|---|---|---|---|---|---|---|
| M | W | | 6-1 | 210 | HZL | | Bicept Right | |

SIGNATURE OF PERSON FINGERPRINTED — Joe B. McDufie

**SKIN TONE** Light

**SOCIAL SECURITY NO.** 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

**MISC. NO.**

**CITZ**

DRIVER LICENSE NO. | STATE | TYPE | ID CARD NO. | STATE

**ALIAS NAME(S)**

**ADDRESS** 303 South Shore Drive

**CITY** Port Mansfield

**STATE** Tx

**ZIP** 78598

**ORI** 2450000  **ARRESTING AGENCY**

TRANS. HAZ. MATERIAL? Y OR N

OPER COM. VEHICLE? Y OR N

LIC PLATE NO. | STATE | YEAR

**DATE OF ARREST** 01-18-01

**AGENCY ARREST NO.**

**NAME:** WCSO

**AGENCY CASE NO.**

**FIREARM CODE**

**PRINTED BY:** Ameliee

**DATE** 01-18-

| TRS | OFFENSE CODE | GOC | OFFENSE | STATUTE CITATION | LEVEL & DEGREE | FELONY CAPITAL, 1, 2, OR 3 | MISDEMEA A. OR B |
|---|---|---|---|---|---|---|---|
| A001 | | | Warrants #39342 #39344 | | | | |



| 1. R. THUMB | 2. R. INDEX | 3. R. MIDDLE | 4. R. RING | 5. R. LITTLE |
|---|---|---|---|---|

| 6. L. THUMB | 7. L. INDEX | 8. L. MIDDLE | 9. L. RING | 10. L. LITTLE |
|---|---|---|---|---|

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | L. THUMB | R. THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

```
4.0.RVSZ
TXL450000
NO IDENTIFIABLE RECORD IN THE NCIC INTERSTATE IDENTIFICATION INDEX
(III) FOR NAM/MCDUFFIE,JOE BRUCE.SEX/M.RAC/W.DOB/19560302.PUR/C.
NOTICE -- A LARGE NUMBER OF RECORDS FOR PERSONS BORN PRIOR TO 1956 ARE
NOT AUTOMATED BY THE FBI. IF A SEARCH OF THE NONAUTOMATED FILES IS
DESIRED, A FINGERPRINT CARD SHOULD BE SUBMITTED.
END
```

```
OUTPUT MSG 437,     FROM NIC# FOR RVSZ    01/18/01 21:36
DISSEMINATED ON TLETS FOR CRIMINAL JUSTICE PURPOSES ONLY
```

# WARRANT OF ARR. I

**THE STATE OF TEXAS**
**vs.**
**JOE MCDUFFY**

303 SOUTH SHORE DR.
PORT MANFIELD, TX
DOB:



**JUSTICE OF THE PEACE, Pct. #1**

**WILLACY COUNTY, TEXAS**

Docket No. CR- - 38342

Issued Date: January 18, 2001

## THE STATE OF TEXAS

TO ANY PEACE OFFICER OF THE STATE OF TEXAS, GREETINGS:
YOU ARE HEREBY COMMANDED TO ARREST **JOE MCDUFFY** if to be found in your county and bring him/her before me, the undersigned Justice of the Peace in and for Precinct No. 1 of Willacy County, Texas at my office at the Willacy County Correction Facility at 576 W. Main, Room 101 in Raymondville, Texas in said County, **INSTANTER**, then and there to answer the State of Texas for the offense against the laws of said State, to wit:

**DEADLY CONDUCT (F3)** of which **JOE MCDUFFY** is accused by written complaint under oath of **JENNIFER KEESE** filed before me.
Herein Fail not, but of this writ make due return, showing how you have executed the same.

AGAINST THE PEACE AND DIGNITY OF THE STATE

Witness my Official Signature, this 18th day of January, 2001.

Justice of the Peace, Precinct No. 1

Bond Amount:      $      .00
Fine Cost:    .      $      .00
Court Cost:       $      .00
Warrant Fee:      $      .00
Total:        $      .00

Ticket Number:        Case Number: CR- - 38342

## OFFICER'S RETURN

Came to hand the _18th_ day of _January_, A.D. 20 _01_, at _3:00_ o'clock _P_.M. and executed the _18th_ day of _January_, A.D. 20 _01_, by arresting the within named **JOE MCDUFFY** at _Port Mansfield_ in _Willacy_ County, Texas and:
* taking $_____ bond
* placing the Defendant in the County Jail at _____, Texas to be dealt with by said magistrate according to law.

_Larry C Spence._

Sheriff of _Willacy_ County, Texas

By _____, Deputy

Apollo Software, Inc. - Austin, Texas

# WARRANT OF ARREST

**THE STATE OF TEXAS**
vs.
**JOE MCDUFFY**

303 SOUTH SHORE DR.
PORT MANSFIELD, TX 78598
DOB:



**JUSTICE OF THE PEACE, Pct. #1**

**WILLACY COUNTY, TEXAS**

Docket No. CR- -  38344

Issued Date: January 18, 2001

## THE STATE OF TEXAS

TO ANY PEACE OFFICER OF THE STATE OF TEXAS, GREETINGS:
YOU ARE HEREBY COMMANDED TO ARREST **JOE MCDUFFY** if to be found in your county and bring him/her before me, the undersigned Justice of the Peace in and for Precinct No. 1 of Willacy County, Texas at my office at the Willacy County Correction Facility at 576 W. Main, Room 101 in Raymondville, Texas in said County, **INSTANTER**, then and there to answer the State of Texas for the offense against the laws of said State, to wit:

**CRUELTY TO ANIMALS (MA)** of which **JOE MCDUFFY** is accused by written complaint under oath of **JENNIFER KEESE** filed before me.
Herein Fail not, but of this writ make due return, showing how you have executed the same.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Witness my Official Signature, this 18th day of January, 2001.

Justice of the Peace, Precinct No. 1

| | | |
|---|---|---|
| Bond Amount: | $ | .00 |
| Fine Cost: | $ | .00 |
| Court Cost: | $ | .00 |
| Warrant Fee: | $ | .00 |
| Total: | $ | .00 |

Ticket Number:          Case Number: CR- -  38344

## OFFICER'S RETURN

Came to hand the _12th_ day of _January_ , A.D. 20_01_ , at _8:00_ o'clock _5_ .M. and executed the _12th_ day of _January_ , A.D. 20_01_ , by arresting the within named **JOE MCDUFFY** at _Port Mansfield_ in _Willacy_ County, Texas and:
* taking $_____ bond
* placing the Defendant in the County Jail at _____ , Texas to be dealt with by said magistrate according to law.

Sheriff of _Willacy_ County, Texas

By _____ , Deputy

# THE STATE OF TEXAS )(
# COUNTY OF WILLACY )(

BEFORE ME, The Undersigned Authority In And For Willacy County, Texas, on this 20 day of December , 2000 , A.D., did personally appear :
Jennifer Keese , who after being by me duly sworn, did depose and say:

My name is Jennifer Keese . I am currently 34 Years old.
My date of birth is: 03/28/66 .
I currently reside at: 123 Beach Street Port Mansfield, Texas .
My telephone number is: 956-944-2247 .
I am currently employed at: Pelican's .

On Friday December 15th, 2000 I was driving behind a school bus at about 7:00 am. after dropping off my kids for school, the dog was in the middle of the roadway in between the school bus and my vehicle. I heard a gun shot and saw the dog jump and turned around toward the Mcduffy house and bark, the dog then ran down the street towards the East and ran under Barbra and Denny Creagen's house, me and my friend Donna T. Fickland followed the dog and did not see any apparent injury to the animal, and we just left the dog alone and went about our business. I would also like to state that he fired the weapon in the direction of the school bus in a residential area.

The above is a true and correct statement to the best of knowledge and ability.

_Jennifer Keese_

Subscribed and sworn before me this 20 day of December , 2000, A.D.

Notary Public in and for the State of Texas

My Commission Expires: August 28, 2004

JOSEFINA G. FAMBROUGH
MY COMMISSION EXPIRES
August 28, 2004

# OFFENSE REPORT

False Report/ Perjury
Classification

NO 01-0219

| 1. COMPLAINANT'S NAME (Firm name of business) | 2. AGE | DESCENT | SEX | DOB | 3. PHONE (Business) |
|---|---|---|---|---|---|
| State Of Texas | | | | /-/-/ | 956-///-//// |
| 4. COMPLAINANT'S ADDRESS | 5. CITY | | | | 6. PHONE (Residence) |
| 540 West Hidalgo St. | Raymondville, Texas | | | | 956-689-2164 |
| 7. COMPLAINANT'S BUSINESS, EMPLOYMENT OR SCHOOL | 8. OBJECT OF ATTACK (Burglary, theft, assault, etc.) | | | | |
| District Attorneys Office | See Classification | | | | |
| 9. PLACE WHERE OFFENSE OCCURRED | 10. TYPE OF BUILDING (Residence, store, bank, etc.) | | | | |
| 576 West Main St./Raymondville, Tx. | Office Bldg. | | | | |
| 11. REPORTED BY | PHONE | 12. REPORTED TO | | | |
| Ruth Gomez | 689-2164 | Willacy County Sheriff's Dept. | | | |
| 13. DAY, DATE AND TIME OF OFFENSE | 14. DAY, DATE AND TIME OF REPORT | | | | |
| Friday  12-15-2000  9:30AM | Wednesday 03-07-2001 12:40PM | | | | |
| 15. BODILY INJURIES TO | HOSPITAL? | 16. HOW REPORTED (In person, phone, on view, other) | | | |
| None | No | In Person | | | |

17. M'O (How done-force used-at what point-with what tool or weapon-other acts or trade marks)

Suspect  with intent to deceive he/ she knowingly made false statements that was material to a criminal investigation.
17A. EXACT WORDS USED BY OFFENDER

See case file copy # 00-0898.

18. VEHICLE INVOLVED IN OFFENSE (Year-color-make-model-auto license no.-year-state)        Complainant's [ ]  Suspect's [ ]

None

| 19. DIRECTION OF FLIGHT STREET OR ROAD | [ ] N [ ] E [ ] S [ ] W | 20. AUTO [ ] FOOT | 20. WILL COMPLAINANT PROSECUTE? |
|---|---|---|---|
| Unknown | [ ] UNK [ ] OTHER | | Yes |

21. NAME AND ADDRESS OF SUSPECT(S) OR AGE DESCENT SEX DESCRIPTION

1. Jennifer Keese ,34YOA, White,Female,DOB 03-28-66, 123 Beach St.Port Mansfield ,Tx.

22. CIRCLE IF SUSPECT IS
Employee-Relative- Acquaintance

2.

| 23 WITNESSES NAME. | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN |
|---|---|---|---|---|---|
| 1. See Supplement. | | | 956-///-//// | | |
| 2 None | | | 956-///-//// | | |

24. NARRATIVE (Write in any available details not covered above)

On above date , time , and location, Mr. & Mrs. Mcduffy  of  303 So. Shore Drive Of Port Mansfield Tx. arrived at the Willacy County Sheriff's Dept. stating that Assistant District Attorney of Willacy County  Ruth Gomez had sent then to file charges on the above suspect. The above said suspect with intent to deceive he or she knowingly made a false statement  to Investigator Guillermo Salinas,The Honorable Justice Of The Peace Pct.1 Richard Solis and Notary  Public Of  The State Of  Texas Josefina G Fambrough  that was material to a criminal investigation.

| 25 INVESTIGATING OFFICER(S) | 26 REPORT MADE BY Deputy Carlos A. Londrie | DATE 03-07-2001 |
|---|---|---|

| 27 CASE FILED | 28 THIS CASE IS | 29 APPROVED BY |
|---|---|---|
| Yes [ ]  No [ ]  Cleared by arrest [ ] | Unfounded [ ]  Inactive [ ]  Other [ ] | |

# OFFENSE REPORT

Deadly Conduct/Cruelty to Animals
**Classification**

NO. __00-0898__

| 1 COMPLAINANTS NAME (Firm name of business) | | 2 AGE | DESCENT | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|---|
| Jennifer Keese | | 34 | White | F | 03/28/66 | (956) |

| 4 COMPLAINANT'S ADDRESS | 5 CITY | 6 PHONE (Residence) |
|---|---|---|
| 123 Beach Street | Port Mansfield, Texas | (956) 944-2247 |

| 7 COMPLAINANTS BUSINESS, EMPLOYMENT OR SCHOOL | 8 OBJECT OF ATTACK (Burglary, theft, assault, etc.) |
|---|---|
| Pelican's Bar and Grill | See Above Classification |

| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING (Residence, store, bank, etc.) |
|---|---|
| | Roadway (Public) |

| 11 REPORTED BY | PHONE | 12 REPORTED TO |
|---|---|---|
| Jennifer Keese | 944-2247 | Willacy County Sheriff's Department |

| 13 DAY, DATE AND TIME OF OFFENSE | 14 DAY DATE AND TIME OF REPORT |
|---|---|
| Friday  12-15-00  Approx. 8:00 am | Friday  12-15-00  9:30 am |

| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED (in person, phone, on view, other) |
|---|---|---|
| None | No | In Person |

**17 M/O (How done-force used-at what point-with what tool or weapon-other acts or trade marks)**

Suspect shot dog that was walking on the road in front of suspects residence with a firearm. (Upper back wound).

**17A EXACT WORDS USED BY OFFENDER**

Unknown

| 8 VEHICLE INVOLVED IN OFFENSE (Year-color-make-model-auto license no.-year-state) | Complainant's ☐ | Suspect's ☐ |
|---|---|---|
| None | | |

| 19 DIRECTION OF FLIGHT STREET OR ROAD | 20 WILL COMPLAINANT PROSECUTE? |
|---|---|
| ☐N ☐E ☐S ☐W   ☐AUTO ☐FOOT ☒LINK ☐OTHER | No |

| 21 NAME AND ADDRESS OF SUSPECT(S) OR AGE DESCENT SEX DESCRIPTION | 22 CIRCLE IF SUSPECT IS |
|---|---|
| 1 Joe McDuffy White, Male 303 South Shore Drive Portmansfield Texas | Employee-Relative- Acquaintan |
| 2 Unknown | |

| 23 WITNESSES NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDI |
|---|---|---|---|---|---|
| 1 Donna T. Flickland | | | 944-2369 | | |
| 2 | | | | | |

**24 NARRATIVE (Write in any available details not covered above)**

ON FRIDAY, DECEMBER 15, 2000, I DEPUTY NICOLLS WAS ADVISED TO CALL COMPLAINANT, IN REFERENCE TO A STRAY DOG THAT HAD BEEN SHOT. UPON SPEAKING WITH COMPLAINANT SHE ADVISED THAT ABOVE NAMED SUSPECT SHOT A STRAY DOG AND THAT THE DOG WAS STILL ALIVE. COMPLAINANT ADVISED THAT SHE SAW THE PERSON WHO DID IT. COMPLAINANT ADVISED THAT SHE AND HER FRIEND DONNA T. FLICKLAND FOLLOWED THE DOG WHICH RAN TOWARD A RESIDENCE WHO IS OWNED BY DENNY CREAGEN. I REPORTED THE INCIDENT AND ASST. SUPERINTENDENT OF THE NAVIGATION DISTRICT FRANK VASQUEZ PICK UP THE DOG AND TOOK HIM TO DR. PICKARD'S IN RAYMONDVILLE.

RECEIVED
01.705
FEB 2 1 2001
CO & DIST ATTORNEY

| 25 INVESTIGATING OFFICER(S) | 26 REPORT MADE BY Guillermo Salinas Jr. | DATE 121500 |
|---|---|---|

| 27 CASE FILED | 28 THIS CASE IS | 29 APPROVED BY |
|---|---|---|
| Yes ☒  No ☐ | Cleared by arrest ☐  Unfounded ☐  Inactive ☐  Other ☐ | Guillermo Salinas Jr. |

**AGISTRATE'S WARNING CERTI** ﹜ **TE**

NO. _38342_

| THE STATE OF TEXAS | X | IN THE JUSTICE COURT |
| VS. | X | PCT. _1_ , PLACE _1_ |
| Joe McDuffy | X | Willacy COUNTY, TEXAS |

THIS IS TO CERTIFY that on the _14_ day of _January_ , 2000, at _8:45_ _A_ .M., _Joe McDuffy_ appeared before me in the City of _Raymondville_ , _Willacy_ , County, Texas, under arrest and in the custody of _Javier Gomez_ , _deputy_ , of Willacy County, Texas, at which time and place I administered to him the warnings required by Article 15.17 of the Texas Code of Criminal Procedure, by informing him in clear language, as follows:

☑1.  You are accused of _Deadly Conduct — (F3)_ .
An affidavit charging you with this offense has/~~has not~~ been filed in this Court.

☐2.  You have the right to an attorney, and to have your attorney present during any interview with peace officers or attorneys representing the state. If you are indigent and cannot afford an attorney, you have the right to request an attorney to represent you and advise you.

☑3.  You have the right to end any interview or questioning being done by peace officers or attorneys representing the state at any time.

☐4.  You have the right to remain silent.

☐5.  You are not required to make any statements, but any statement you do make can and may be used against you in Court.

☐6.  You may have the right to an examining trial, if you are charged with a felony.

☑7.  You also have reasonable time and opportunity to consult with an attorney if you so desire.

In accordance with the law, bail was:

☑ Set in the amount of $ _10,000.00 PR BOND_
☐ Not determined.
☐ Denied (Reason_____.)

IN WITNESS hereof, I have subscribed my name on this _14_ day of _January_ , 2000.

_Richard Soliz_
Magistrate

I hereby acknowledge that the above warning were administered to me in clear language and I fully understand the meaning of each and every warning.

_Joe B. McDuffy_                                    _____
Accused                                              Witness

Remarks:_____

Apollo Software, etc. • Austin, Texas

# WARRANT OF ARREST

**THE STATE OF TEXAS**
**vs.**
**JOE MCDUFFY**

303 SOUTH SHORE DR.
PORT MANFIELD, TX
DOB:



**JUSTICE OF THE PEACE, Pct. #1**

**WILLACY COUNTY, TEXAS**

Docket No. CR- -  38342

Issued Date: January 18, 2001

## THE STATE OF TEXAS

TO ANY PEACE OFFICER OF THE STATE OF TEXAS, GREETINGS:
YOU ARE HEREBY COMMANDED TO ARREST **JOE MCDUFFY** if to be found in your county and bring him/her before me, the undersigned Justice of the Peace in and for Precinct No. 1 of Willacy County, Texas at my office at the Willacy County Correction Facility at 576 W. Main, Room 101 in Raymondville, Texas in said County, **INSTANTER**, then and there to answer the State of Texas for the offense against the laws of said State, to wit:

      **DEADLY CONDUCT (F3)** of which **JOE MCDUFFY** is accused by written complaint under oath of **JENNIFER KEESE** filed before me.
      Herein Fail not, but of this writ make due return, showing how you have executed the same.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

    Witness my Official Signature, this 18th day of January, 2001.

Justice of the Peace, Precinct No. 1

| | | |
|---|---|---|
| Bond Amount: | $ | .00 |
| Fine Cost: | $ | .00 |
| Court Cost: | $ | .00 |
| Warrant Fee: | $ | .00 |
| Total: | $ | .00 |

Ticket Number:        Case Number: CR- -  38342

## OFFICER'S RETURN

    Came to hand the 18th day of January, A.D. 20 01, at 8:00 o'clock P.M. and executed the 18th day of January, A.D. 20 01, by arresting the within named **JOE MCDUFFY** at Port Mansfield in Willacy County, Texas and:
    * taking $_____ bond
    * placing the Defendant in the County Jail at _____, Texas to be dealt with by said magistrate according to law.

Larry G Spence.

Sheriff of Willacy County, Texas

By _____, Deputy

# OFFENSE REPORT

## Deadly Conduct/Cruelty to Animals
Classification

NO. 00-0898

| 1 COMPLAINANTS NAME (Firm name of business) | | 2 AGE | DESCENT | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|---|
| Jennifer Keese | | 34 | White | F | 03/28/66 | (956) |
| 4 COMPLAINANT'S ADDRESS | | 5 CITY | | | | 6 PHONE (Residence) |
| 123 Beach Street | | Port Mansfield, Texas | | | | (956) 944-2247 |
| 7 COMPLAINANTS BUSINESS, EMPLOYMENT OR SCHOOL | | 8 OBJECT OF ATTACK (Burglary, theft, assault, etc.) | | | | |
| Pelican's Bar and Grill | | See Above Classification | | | | |
| 9 PLACE WHERE OFFENSE OCCURRED | | 10 TYPE OF BUILDING (Residence, store, bank, etc.) | | | | |
| | | Roadway (Public) | | | | |
| 11 REPORTED BY | PHONE | 12 REPORTED TO | | | | |
| Jennifer Keese | 944-2247 | Willacy County Sheriff's Department | | | | |
| 13 DAY, DATE AND TIME OF OFFENSE | | 14 DAY DATE AND TIME OF REPORT | | | | |
| Friday  12-15-00  Approx. 8:00 am | | Friday  12-15-00  9:30 am | | | | |
| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED (in person, phone, on view, other) | | | | |
| None | No | In Person | | | | |

17 M/O (How done-force used-at what point-with what tool or weapon-other acts or trade marks)

Suspect shot dog that was walking on the road in front of suspects residence with a firearm. (Upper back wound).

17A EXACT WORDS USED BY OFFENDER

Unknown

8 VEHICLE INVOLVED IN OFFENSE (Year-color-make-model-auto license no.-year-state)     Complainant's ☐  Suspect's

None

| 19 DIRECTION OF FLIGHT | ☐N ☐E ☐S ☐W | ☐ AUTO ☐ FOOT | 20 WILL COMPLAINANT PROSECUTE? |
|---|---|---|---|
| STREET OR ROAD | | ☒ LINK ☐ OTHER | No |

21 NAME AND ADDRESS OF SUSPECT(S) OR AGE DESCENT SEX DESCRIPTION

: Joe McDuffy White, Male 303 South Shore Drive Portmansfield Texas

22 CIRCLE IF SUSPECT IS
Employee-Relative- Acquaintan

: Unknown

| 23 WITNESSES NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDI. |
|---|---|---|---|---|---|
| : Donna T. Flickland | | | 944-2369 | | |
| : | | | | | |

24 NARRATIVE (Write in any available details not covered above)

ON FRIDAY, DECEMBER 15, 2000, I DEPUTY NICOLLS WAS ADVISED TO CALL COMPLAINANT, IN REFERENCE TO A STRAY DOG THAT HAD BEEN SHOT. UPON SPEAKING WITH COMPLAINANT SHE ADVISED THAT ABOVE NAMED SUSPECT SHOT A STRAY DOG AND THAT THE DOG WAS STILL ALIVE. COMPLAINANT ADVISED THAT SHE SAW THE PERSON WHO DID IT. COMPLAINANT ADVISED THAT SHE AND HER FRIEND DONNA T. FLICKLAND FOLLOWED THE DOG WHICH RAN TOWARD A RESIDENCE WHO IS OWNED BY DENNY CREAGEN. I REPORTED THE INCIDENT AND ASST. SUPERINTENDENT OF THE NAVIGATION DISTRICT FRANK VASQUEZ PICK UP THE DOG AND TOOK HIM TO DR. PICKARD'S IN RAYMONDVILLE.

| 25 INVESTIGATING OFFICER(S) | 26 REPORT MADE BY  Guillermo Salinas Jr. | DATE 121500 |
|---|---|---|

| 27 CASE FILED | | 28 THIS CASE IS | | | | 29 APPROVED BY |
|---|---|---|---|---|---|---|
| Yes ☒  No ☐ | Cleared by arrest ☐ | Unfounded ☐ | Inactive ☐ | Other ☐ | | Guillermo Salinas Jr. |

THE STATE OF TEXAS      )(
COUNTY OF WILLACY       )(


BEFORE ME, The Undersigned Authority In And For Willacy County, Texas, o
this 20 day of December_____, 2000, A.D., did personally appear
_____Jennifer Keese_____, who after being by me dul
sworn, did depose and say:

My name is___Jennifer Keese_____. I am currently 34 Years old.
My date of birth is:___03/28/66_____.
I currently reside at: 123 Beach Street Port Mansfield, Texas_____.
 My telephone number is: 956-944-2247_____
I am currently employed at: Pelican's_____.


    On Friday December 15th, 2000 I was driving behind a school bus at about
7:00 am. after dropping off my kids for school, the dog was in the middle of
the roadway in between the school bus and my vehicle. I heard a gun shot and
saw the dog jump and turned around toward the Mcduffy house and bark, the dog
then ran down the street towards the East and ran under Barbra and Denny
Creagen's house, me and my friend Donna T. Fickland followed the dog and did
not see any apparent injury to the animal, and we just left the dog alone and
went about our business. I would also like to state that he fired the weapon
in the direction of the school bus in a residential area.


The above is a true and correct statement to the best of knowledge and
ability.

_Jennifer Keese_____

Subscribed and sworn before me this 20 day of December, 2000 A.D.

_____
Notary Public in and for the State of Texas

My Commission Expires: _August 28, 2004_

JOSEFINA G. FAMBROUGH
MY COMMISSION EXPIRES
August 28, 2004

# THE STATE OF TEXAS

COUNTY OF .....WILLACY..................................

} Know all Men by these Presents:

THAT I, __Joe McDuff,_____, AS PRINCIPAL AM HELD AND FIRMLY BOUND UNTO THE STATE OF TEXAS IN THE PENAL SUM OF _____ __One thousand dollars_____ ( $ _1000⁰⁰_ ) DOLLARS FOR THE PAYMENT OF WHICH SUM, WELL AND TRULY TO BE MADE, AND ALL ADDITIONAL FEES AND EXPENSES THAT MAY BE INCURRED BY PEACE OFFICERS IN RE-ARRESTING ME IN THE EVENT THE CONDITIONS OF THIS BOND ARE VIOLATED, I DO BIND MYSELF MY HEIRS, EXECUTORS AND ADMINISTRATORS, JOINTLY AND SEVERALLY BY THESE PRESENTS.

THE CONDITIONS OF THE ABOVE OBLIGATION IS SUCH WHEREAS I AS THE ABOVE NAMED PRINCIPAL, stands charge by complaint-indictment duly filed-presented in the _Justice of the Peace_ Court, Precinct No. _1_____, of Willacy County, Texas, with the offense of felony - Misdemeanor, to-Wit: _Cruelty to Animals_____. Cause No. _38340_____. And that I am required to give bail in the sum of $ _1000⁰⁰_____ for my personal appearance before the _____ ___County_____ Court of Willacy County, Texas.

NOW IF I shall well and truly make my personal appearance instanter before the ___County____ Court of Willacy County, Texas, at its present term, if now in session, or at its next regular term if now in vacation, to be held at the courthouse of Willacy County, in the City of Raymondville, Texas, and further, shall well and truly make my personal appearance before the said court of Willacy County, Texas, as well as before any other court to which the same may be transferred and for any and all subsequent proceedings that may be had relative to the said charge in the course of the criminal action based on said charge, and there remain from day to day and from term to term of said Court, until discharged by due course of law, then and there to answer said accusations against me, this obligation shall become void; otherwise to remain in full force and effect.

Signed and dated this the _19_ day of _January_____, 19 _2000_ .

_____
SIGNATURE OF PRINCIPAL

TAKEN AND APPROVED THIS _22_ day of _____, 19_2001_.

_____
_P.O. Box 256, Fort Mansfield, t_
MAILING ADDRESS                     _785_

( _956_ ) _944-2777_
AREA CODE    TELEPHONE NUMBER

_____ COUNTY, TEXAS

BY

# THE STATE OF TEXAS

COUNTY OF ......WILLACY..........................

Know all Men by these Presents:

THAT I, __Joe McDuffy__ , AS PRINCIPAL AM HELD AND
FIRMLY BOUND UNTO THE STATE OF TEXAS IN THE PENAL SUM OF _____
__ten thousand dollars__ ( $ 10,000⁰⁰ ) DOLLARS FOR THE
PAYMENT OF WHICH SUM, WELL AND TRULY TO BE MADE, AND ALL ADDITIONAL FEES
AND EXPENSES THAT MAY BE INCURRED BY PEACE OFFICERS IN RE-ARRESTING ME
IN THE EVENT THE CONDITIONS OF THIS BOND ARE VIOLATED, I DO BIND MYSELF
MY HEIRS, EXECUTORS AND ADMINISTRATORS, JOINTLY AND SEVERALLY BY THESE
PRESENTS.

THE CONDITIONS OF THE ABOVE OBLIGATION IS SUCH WHEREAS I AS THE
ABOVE NAMED PRINCIPAL, stands charge by complaint-indictment duly filed-
presented in the __Justice of the Peace__ Court, Precinct No. __1__ ,
of Willacy County, Texas, with the offense of __felony__ - Misdemeanor, to-
Wit: __Deadly Conduct__ _____
Cause No. __38342__ . And that I am required to give bail in the sum of
$ __10,000⁰⁰__ for my personal appearance before the _____
__District__ Court of Willacy County, Texas.

NOW IF I shall well and truly make my personal appearance instanter
before the __District__ Court of Willacy County, Texas, at its
present term, if now in session, or at its next regular term if now in
vacation, to be held at the courthouse of Willacy County, in the City of
Raymondville, Texas, and further, shall well and truly make my personal
appearance before the said court of Willacy County, Texas, as well as
before any other court to which the same may be transferred and for any
and all subsequent proceedings that may be had relative to the said
charge in the course of the criminal action based on said charge, and
there remain from day to day and from term to term of said Court, until
discharged by due course of law, then and there to answer said accusations
against me, this obligation shall become void; otherwise to remain in full
force and effect.

Signed and dated this the __19__ day of __January__ , 19 __2000__ .

_____
SIGNATURE OF PRINCIPAL

__P.O. Box 256__
__Port Mansfield, tx 78598__
MAILING ADDRESS

__(956) 944-2777__
AREA CODE    TELEPHONE NUMBER

TAKEN AND APPROVED THIS __22__
__day of__ _____ , 19 __2001__ .

_____
SHERIFF OF WILLACY COUNTY, TEXAS

BY

JAILER: SGT. L. REYNA    SHIFT: 1

DATE: JANUARY- 18 - -2001.    RADIO LOG    PAGE 2 OF 3

| NIT | SIGNAL | TIME: | 10:8 | TRAFFIC |
|---|---|---|---|---|
| 4/D2 | 10-17 | 2008 | | TO 10-50 MINOR |
| D5 | 10-23 | 2009 | | @ 10-50 " |
| D5 | 10-43 | 2010 | | NO EMS NEEDED |
| D5 | CODE 4 | 2010 | | |
| 24/D2 | 10-8 | 2010 | | |
| D5 | 10-43 | 2013 | | REO. DPS UNIT |
| D15 | 10-43 | 2031 | | ADVISED C.P. INVOLVED IN ACCIDENT LOCATED PERSONAL WRECKER |
| D4/D2 | 10-6 | 2039 | | 303 S. SHORE REF: 51:08 |
| D5 | 10-43 | 2041 | | ADVISED DPS 10-23 |
| D4/D2 | 10-43 | 2042 | | 51:08 SERVED 10-17 SHORTLY |
| D4/D2 | 10-8/17 | 2043 | | TO 10-100 W/1X95  SM-15933.9      * |
| D4/D2 | 10-43 | 2045 | | 2ND MIRANDA      * |
| D4/D2 | 10-43 | 2046 | | 1 QUICK STOP @ HIS 83:00 TO PICK UP 1 PIECE OF EQUIPMENT * |
| D5 | 10-43 | 2111 | | WRECKER 10-23      * |
| D4/D2 | 10-100 | 2115 | | W/1X95  EM-15936.7      * |
| D2-/D4 | 10-8/17 | 2129 | | TO D-5's 10-20 |
| T2 | 10-17 | 2133 | | TO 10-91 CALL (TAC 11) |
| OS 4 | MDH | 2136 | | MCDUFFIE JOE BRUCE DOB/3-2-50   SSN# 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 |
| D2/D4 | 10-6 | 2136 | | W/D-5 |
| T2 | 10-23 | 2147 | | @ 10-91 (TAC 11) |
| T2 | 10-8/24 | 2155 | | FROM 10-91 (TAC 11) ALL 10-73 |
| S5 | 10-43 | 2216 | | ADVISED WEIRD RAIN COMING DOWN IN TAC 2 MILKY, BROWNISH |
| D5/D2 | 10-8/24 | 2221 | | FROM 10-50 |
| D4 | 10-8/24 | 2221 | | |
| D4 | 10-17 | 2222 | | TO PAST 31:03 CALL (TAC 4) |
| D5/D2 | 10-17 | 2222 | | TO PAST 31:03 CALL (TAC 1) |
| OS 3/1 | 10-41 | 2227 | | |
| D4 | 10-23 | 2233 | | @ PAST 31:03 CALL (TAC 4) |
| D4 | 10-43 | 2240 | | ADVISED PORTABLE 10-7 |
| D2/D5 | 10-23 | 2241 | | @ 31:03 (TAC 1) |
| D4 | 10-8/24 | 2245 | | FROM BURG. OF HABITATION CALL (TAC 4) REFERRED TO C.I.D. |
| D4 | 10-17 | 2245 | | TO 10-36V CALL |
| 1E2 | STATUS | 2249 | | D5/D2 - 10-73 |
| D6 | 10-8/41 | 2251 | | |
| D4 | | 2254 | | 1425/490 DARK RNGR. P/K THAT JUST TOOK OFF FROM |
| D2/D5 | 10-8/24 | 2254 | | FROM 30:02 CALL |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
RECEIVED

DEC - 7 2001

Michael N. Milby, Clerk of Court

JOE B. MCDUFFIE and
KATHERINE MCDUFFIE
    Plaintiffs,

VS

Civil Action No. B-01-143

GUILLERMO SALINAS, JR
HECTOR GARZA
JENNIFER KEESE
WILLACY COUNTY SHERIFF DEPARTMENT
WILLACY COUNTY NAVIGATION DISTRICT
    Defendants

### THIRD AMENDED ORIGINAL PETITION

To the Honorable Judge of Said Court:

    COMES NOW, Joe B. McDuffie and Katherine L. McDuffie, and files this their Third Amended Original Petition in the above styled and numbered Civil Action and for their grounds would show the Court the following:

**I.**

    Plaintiffs, Joe B. McDuffie and Katherine L. McDuffie, are individuals residing in Port Mansfield, Willacy County, Texas, at 303 S. Shore Dr., Port Mansfield, Willacy County, Texas.
    Defendant, Guillermo Salinas, Jr., is an individual who resides in Raymondville, Willacy County, Texas and may be served at Willacy County Sheriffs Department, Raymondville, Willacy County, Texas, at 576 W. Main, Raymondville, Willacy County, Texas.
    Defendant, Hector Garza, is an individual who resides in Port Mansfield, Willacy County, Texas and may be served at Port Mansfield, Willacy County, Texas at 100 Beacon Street, Port Mansfield, Willacy County, Texas.
    Defendant, Jennifer Keese, is an individual who resides in Port Mansfield, Willacy County, Texas and may be served at Port Mansfield, Willacy County, Texas at 123 Beach Street, Port Mansfield, Willacy County, Texas.
    Defendant, Willacy County Sheriff Department, is a local government entity that resides in Raymondville, Willacy County, Texas and may be served at Willacy County Sheriff Department, 576 W. Main, Raymondville, Willacy County, Texas.
    Defendant, Willacy County Navigation District, is a local government entity that resides in Willacy County, Texas and may be served at 295 E. Hidalgo, Raymondville, Willacy County, Texas.

**II.**

#### Jurisdiction and Venue

    Jurisdiction is proper in this court in that the amount of damages is within the jurisdictional limits of this court.
    Venue is proper in that this cause of action based in Federal and/or Constitutional Law occured in this district.
    This law suit is seeking damages for $50,000.00 (fifty thousand dollars), Level 1 Discovery Control Plan, pursuant to Texas Rules of Civil Procedure 190.2.



EXHIBIT
4

# III.

## Facts

### 1.

On or about the morning of December 15, 2000, around 7:05 am Plaintiff's wife had been outside getting Plaintiff's three children off on the San Perlita school bus. The bus had left the bus stop when Plaintiff's wife came in telling Plaintiff that there was a loose dog and it was bothering Plaintiff's dog, which Plaintiff's dog was chained to a tree in Plaintiff's front yard. Plaintiff was sitting at his computer desk in the living room when Plaintiff's wife told him about the stray dog. Plaintiff's wife is handicapped and wears a knee brace, she would be no match if she was ever attacked by a dog. Plaintiff went out with the intention of getting Plaintiff's dog out of harms way and bring Plaintiff's dog inside the house. Plaintiff had previous contact with this stray dog at a boat storage unit where the stray dog growled and bared its teeth at Plaintiff. Plaintiff had to get up from the computer, go to the his bedroom in the back of the house, unlock the gun cabinet in his bedroom and retrieve his 410 gauge shot gun and bird shot gun shell. As Plaintiff walked out into his front yard, the stray dog was snarling, baring its teeth only inches away from Plaintiff's dog, it turned towards Plaintiff who was in a position in which he could not run back to the house. That's when Plaintiff shot the dog because he was in immediate danger and could not get away and the dog was acting like it had rabies. Plaintiff's wife was in the house at the front door and was witness to the incident (Exhibit A is an Affadavit from Katherine L. McDuffie, Plaintiff's wife and said document is hereby incorporated by reference as if fully copied herein). The San Perlita school bus was nowhere in sight, it had already turned onto an intersecting street and at the next bus stop several streets down, well out of the line of fire (Exhibit B is an Affadavit from Josie Catherine Hough, a sixteen year old Sophomore student attending San Perlita High School who gets on the San Perlita school bus at the next bus stop after Plaintiff's house and said document is hereby incorporated by reference as if fully copied herein). A person cannot even see Plaintiff's house from that bus stop (Exhibit C are true and correct copies of two satelite images from the Internet Website of Microsoft Terra Server, the images are the courtesy of the United States Geological Survey of the south side of Port Mansfield, Willacy County, Texas and a map of Port Mansfield identifying the names of the streets and demonstrating the two locations of the San Perlita school bus stops for Plaintiff's children and Witness Josie Catherine Hough and said copies is hereby incorporated by reference as if fully copied herein). Across the street from Plaintiff's house is an empty field.

### 2.

Defendant Jennifer Keese called in a complaint that morning telling Deputy Nicolls that she had seen Plaintiff shoot a stray dog, no mention of a school bus on the initial complaint Offense Report (Exhibit D is a true and correct copy of the initial Offense Report taken by Deputy Nichols and said copy is hereby incorporated by reference as if fully copied herein). The three following sworn statements made by Defendant Jennifer Keese are inconsistent with the original complaint Offense Report (Exhibit E is a true and correct copy of the Affadavit from Defendant Jennifer Keese made 5 days after the intial Offense Report and said document is hereby incorporated by reference as if fully copied herein)(Exhibit F is a true and correct copy of an Affadavit from Defendant Jennifer Keese on January 17,2001 for Cruelty to Animals and said document is hereby incorporated by reference as if fully copied herein) (Exhibit G is true and correct copy of an Affadavit from Defendant Jennifer Keese on January 17, 2001 for Deadly Conduct and said document is hereby incorporated by reference as if fully copied herein). In the Initial complaint filed December 15,2000 by Defendant Jennifer Keese (Exhibit D) she refers to the dog as a stray dog, yet by January 17, 2001 she signed an Affadavit (Exhibit F) that the dog belongs to someone. Defendant Jennifer Keese never claimed to be the owner of the stray dog, only that she knew who the owner was. Defendant Guillermo Salinas Jr., was also aware Defendant Jennifer Keese did not claim to be the owner of the stray dog but said she only knew who owned the dog. Please refer to Plaintiff's wife's affadavit (Exhibit A)where Plaintiff's wife had called the Willacy County Navigation District Harbor Office and specifically asked the Harbor Master Susan Nelson to call all the people that were feeding the stray dog and ask them to come get their loose dog and no one claimed ownership of the stray dog and it was allowed to continue to roam freely with no collar and no tags. Plaintiff had prior knowledge of Defendant Jennifer Keese, whom Plaintiff has no social or casual association with, crusaded to get Plaintiff's wife fired from her job as a substitute teacher at San Perlita ISD and as parent volunteer by giving false statements to Plaintiff's wife's direct supervisor Principal Eberto Mireles which resulted in Plaintiff's wife's requests from the School to substitute teach drasticlty diminished

as evidenced by the W-2 information from San Perlita ISD for the years of 1998 Plaintiff's wife's gross income was $1,327.50, 1999 her gross income was $1,125.00, and 2000 her gross income was $225.00 (Exhibit H is a true and correct copies of Katherine L. McDuffie's W-2 information for the years of 1998, 1999 and 2000 and said copies is hereby incorporated by reference as if fully copied herein). Plaintiff has personal knowledge that Defendant Jennifer Keese made false statements under oath with the intent to deceive.

**3.**

Plaintiff was never questioned by the Sheriff's department including Deputy Nicolls , please refer to Exhibit D, the inital Offense Report on December 15, 2000, Defendant Guillermo Salinas, Jr. or Defendant Hector Garza regarding this complaint. Defendant Guillermo Salinas Jr., preformed an incorrect and improper investigation which lead to the wrongful arrest and wrongful imprisonment of Plaintiff. The Willacy County District Attorney Juan Angel Guerra and The County Attorney Ruth Gomez on March 2, 2001, Motion to Dismiss Cause No. 38342 & 38344 against Plaintiff and signed by Justice of the Peace Richard Solis, for the following reason: INSUFFIECIENT EVIDENCE (Exhibit I is a true and correct copy of the Motion To Dismiss and said copy is hereby incorporated by reference as if fully copied herein).

**4.**

It was easily ascertainable that the dog was a stray. During the week before the incident, Plaintiff's wife had called and complained twice about the loose, stray dog to the Harbor Office of Willacy County Navigation District in Port Mansfield, Willacy County, Texas (Exhibit J is a true and correct copies of the two complaints Plaintiff's wife Katherine L. McDuffie called in and recorded in the message book by Harbor Master Susan Nelson at the Willacy County Navigation District Harbor Office in Port Mansfield, Willacy County, Texas and said copies are hereby incorporated by reference as if fully copied herein). They have been the animal control authority in Port Mansfield, Willacy County, Texas that deals with stray dog complaints. Port Mansfield, Willacy County, Texas is under a rabies quarantine (Exhibit K is a true and correct copies of the Center for Disease Control Internet Website that instructs adults and children on how to deal with stray animals or sickly animals and said copies are hereby incorporated by reference as if fully copied herein) and there is an ordinance for Port Mansfield, Willacy County Navigation District, Willacy County, Texas, that dogs are to be confined or restained by a leash (Exhibit L is a true and correct copies of the Willacy County Navigation District Ordinances Section 5 which is about Annual Vaccination and Control of Pets and said copies are hereby incorporated by reference as if fully copied herein). Please refer to Plaintiff's wife's Affadavit, Exhibit A.

**5.**

On the night of January 18, 2001, at about 8:45 pm, Defendant Hector Garza came to Plaintiff's house, 303 S. Shore Dr., Port Mansfield, Willacy County, Texas, and arrested Plaintiff for two warrents: Cruelty to Animals, a misdemeanor, (Exhibit M is a true and correct copy of the Warrant of Arrest for Cruelty to Animals and said copy are hereby incorporated by reference as if fully copied herein) and Deadly Conduct, a felony, (Exhibit N is a true and correct copy of the Warrant of Arrest for Deadly Conduct and said copy are hereby incorporated by reference as if fully copied herein). Defendant Hector Garza personally placed the handcuffs extremely tight on Plaintiff before informing Plaintiff that the papers Defendant Hector Garza had were warrants for Plaintiff's arrest, this caused scars on Plantiff's wrists. Plaintiff initally had thought Defendant Hector Garza was bringing Plaintiff the papers Defedant Hector Garza had promised to bring Plaintiff the week before about off road dirt bikes and equipment Defendant Hector Garza had told Plaintiff was mandated by the State of Texas. Defendant Hector Garza did not allow Plaintiff to see the warrants long enough or tell Plaintiff which Justice of the Peace signed it, so as to be allowed to call and negotiate a possible release. Plaintiff was not allowed to complete his dressing appropriate for the extremely cold weather that night. Defendant Hector Garza had placed the handcuffs on too tight that it caused swelling and numbness to Plaintiff's hands and leaving deep wound marks that lasted over four hours. Plaintiff showed the jailer on his arrival to the Willacy County Jail, Willacy County, Texas, the injury to Plaintiff's hands from the tight cuffs. Defendant Hector Garza did not follow department policy and expeditiously deliver Plaintiff to the facility after the arrest, instead Defendant Hector Garza drove Plaintiff down a dark, unlit dirt road, causing undue anxiety for Plaintiff, so Defendant Hector Garza could get his dinner from his house. Defendant Hector Garza did have another Willacy County Sheriff's Deputy with him that night. (Exhibit O is a true and correct copy of the demand notices and are incorporated by reference as

if fully copied herein.) Plaintiff did nothing to provoke such conduct and attitude from Defendant. The arrests were made without probable cause.

**6.**

The claims here are for all unliquidated damages within the jurisdictional limits of this court.

**7.**

Plaintiff Katherine L. McDuffie is a qualified individual with a disability(Exhibit P is a true and correct copies of Plainitff Katherine L. McDuffie's medical records which are in her maiden name Mercer due to insurance reasons, and said copies is hereby incorporated by reference as if fully copied herein) and wears a special made knee brace to ambulate. Plaintiff Katherine L. McDuffie was born with this disability, the left kneecap does not have a ridge on the back of the kneecap to prevent it from dislocating laterally. At the age of 14, Plaintiff Katherine L. McDuffie had a tendon transfer surgery performed that was unsuccessful at correcting the dislocating kneecap. Plaintiff Katherine L. McDuffie is under the care of Dr. Keillor, an Orthopedic Surgeon in Harlingen, Texas. Plaintiff Katherine L. McDuffie called the Willacy County Navigation District Harbor Office and spoke to Harbor Master Susan Nelson on December 7, 2000 and again December 13, 2000, requesting services of a government entity, Defendant Willacy County Navigation District as defined in their Ordinances Section 5 Annual Vaccination and Control of Pets(Exhibit L). Plaintiff Katherine L. McDuffie was informed by the Harbor Master Susan Nelson that Plaintiff was the only person to call and complain about the stray, loose dog. Harbor Mastor Susan Nelson, Superintendant Frank Vasquez and Director Mike Wilson are aware that Plaintiff Katherine L. McDuffie wears a knee brace for her disability. Plaintiff Katherine L. McDuffie asked Susan Nelson during one of the phone calls why Defendant Hector Garza wasn't doing something about the stray dog. Susan Nelson told Plaintiff Katherine L. McDuffie that Defendant Hector Garza "couldn't find the stray, loose dog". Defendant Hector Garza and Sheriff Larry Spence are aware that Plaintiff Katherine L. McDuffie wears a knee brace for her disability. Defendant Willacy County Navigation District and Defendant Willacy County Sheriff Department discriminated against Plaintiff Katherine L. McDuffie, a qualified individual with a disability, by relegation to lesser/no services when Plaintiff Katherine L. McDuffie asked for assistance as defined in Subtitile A of Tittle II of the Americans with Disabilities Act of 1990, Public Law 201-205. 28 CFR PART 35. Defendant Willacy County Navigation District's Ordinances, Regulations, and Facitlites do not address the needs of the disabled individual (They do not accommodate for Disabled parking and accessablity). This discrimination and prejudice results from sterotypic assumptions about the disabled. Plaintiff Katherine L. McDuffie deals with discrimination on a daily basis because her disability is so obvious.

**8.**

Defendant Guillermo Salinas, Jr. and Defendant Jennifer Keese are the only two who had access to the information that was used on the two complaints that where signed by Defendant Jennifer Keese on January 17, 2001 for Cruelty to Animals and Deadly Conduct. Defendant Guillermo Salinas, Jr. and Defendant Jennifer Keese are responsible for falsifing the date of the incident on the two complaints so as to justify and influence the issuing of an instanter warrants for the arrest of Plaintiff Joe. B. McDuffie. The true date of the incident was December 15, 2000, not January 13, 2001 which was falsely put on both complaints on January 17, 2001 for Cruelty to Animals and Deadly Conduct and presented to Justice of the Peace for Precint #1 Richard Solis who then issued Instanter Warrants for the arrest of Plaintiff Joe B. McDuffie based on the false information given to him by Defendant Guillermo Salinas, Jr. and Defendant Jennifer Keese. Both Defendant Guillermo Salinas, Jr. and Defendant Jennifer Keese had knowledge of the documents falsity when they presented the two complaints to Justice of the Peace Richard Solis and that Defendant Jennifer Keese signed on January 17, 2001.

**9.**

On or about August 17, 2001, Defendant Jennifer Keese made another complaint (Exhibit Q is a true and correct copies of the August 17, 2001 Offense Report, Peace Bond Warrant, Instanter Warrant for Arrest and Conditions of On-Going Disputes signed by Plaintiffs and said copies is hereby incorporated by reference as if fully copied herein) against Plaintiff Joe B. McDuffie to Defendant Guillermo Salinas, Jr., about an incident she alleges to have happened on July 3, 2001. Defendant Guillermo Salinas, Jr., again made no attempts to call or visit Plaintiff to investigate Defendant Jennifer Keese's complaint. Plaintiff Joe B. McDuffie denies making Terrorist Threats to Defendant Jennifer Keese on July 3, 2001 or any other time.

The filing of this complaint August 17, 2001 was after Plaintiff Joe B. McDuffie filed his Original Petition in Willacy County Court July 16, 2001which involved both Defendant Jennifer Keese and Defendant Guillermo Salinas, Jr. The date Defendant Jennifer Keese claims the Terroristic Threat was made was on July 3, 2001 prior to Plaintiff's filing his lawsuit  The complaint filed on August 17,2001 was in retaliation to Plaintiff's filing his lawsuit and was filed to belittle and intimidate Plaintiff Joe B. McDuffie into withdrawing  his lawsuit from Willacy County Court.  The fact that it was Defendant Guillermo Salinas, Jr., and Defendant Jennifer Keese directly responsible for this complaint filed August 17, 2001 now demonstrates a pattern of malicious harassment on the part of Defendant Guillermo Salinas, Jr., and Defendant Jennifer Keese.

On the August 17, 2001 complaint filed by Defendant Jennifer Keese she gives a Raymondville Texas address.  Defendant Jennifer Keese continued to physically lived at 123 Beach Street, Port Mansfield, Texas from July 3, 2001 to present, putting her children on the San Perlita School Bus at her usual bus stop since school started August 13, 2001, receiving and signing for Certified Mail Receipts from Plaintiff Joe B. McDuffie, for the address 123 Beach Street, Port Mansfield, Texas, Willacy County, Texas. Defendant Jennifer Keese again intentionally falsified information given on a government document and presented it to Justice of the Peace Richard Solis with knowledge of the document's falsity.

Plaintiffs first learned of the August 17, 2001 complaint filed by Defendant Jennifer Keese when the District Attorney of Willacy County Texas, Juan Angel Guerra, called and set up an appointment for November 14, 2001 with Plaintiffs about an "On-going Dispute" with Defendant Jennifer Keese. The Willacy County District Attorney sends out memos to each Justice of the Peace to have all complaints filed by parties involved in "On-going Disputes" forwarded to the District Attorney's office.  The Willacy County District Attorney Juan Angel Guera, found no merit to this complaint filed August 17,2001 by Defendant Jennifer Keese and allowed it to become a stale complaint.

## IV.

## Causes of Action

### 1.

This action is brought individually and severally on all defendants.  The term defendant includes all defendants, their agents, servants and employers.

### 2.

Plaintiff Joe B. McDuffie brings his action against Defendant Guillermo Salinas, Jr. for:

1. Wrongful arrest is a violation of Plaintiffs' Constitutional Rights provided in the Bill of Rights Amendment IV in the United States Constitution "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searced, and the persons or things to be seized".  The warrants were made out for the arrest of a Joe McDuffy, which is not the correct name of Plaintiff.

2. Malicious prosecution-no probable cause is a violation of Plaintiffs' Constitutional Rights provided in the Bill of Rights Amendment IV in the United States Constitution "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searced, and the persons or things to be seized".

3. Wrongful imprisonment/false imprisonment is a violation of Plaintiffs' Constitutional Rights provided in the Bill of Rights Amendment IV in the United States Constitution "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searced, and the persons or things to be seized".

4. Abuse of office-official oppression, Texas Penal Code 39.03 (1) intentionally subjected Plaintiff to arrest and detention that he knew was unlawful.

5. Negligence, gross and negligence per se.  Texas Penal Code 6.01 Requirement of Voluntary Act or Omission (a) A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession, 6.02 Requirement of Culpability (a)Except as provided in Subsection (b), a person

does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires, 6.03 Definitions of Culpable Mental States (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscioius objective or desire to engage in the conduct or cause the result, 6.04 Causation: Conduct and Results (a) A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. Defendant Guillermo Salinas, Jr. intentionally and knowingly commited acts of omission, which is negligence.

6.  Tampering with Governmental Record, Texas Penal Code 37.10, (a) A person commits an offense if he: (1) knowingly makes a false entry in, or false alteration of, a governmental record, (5) makes, presents, or uses a governmental record with knowledge of its falsity.

7.  Malicious harassment by retailiation, intimidation and belittling with the express purpose of denying Plaintiff Joe B. McDuffie the "Unalienable Rights" in the Declaration of Independence of the United States "among these are Life, Liberty, and the pursuit of Happiness".

**3.**

Plaintiff Joe B. McDuffie brings his action against Defendant Hector Garza for:

1.  Abuse of office, Texas Penal Code 39.02 (2) misused government property-Sheriff Department vehicle. Texas Code of Criminal Procedure Art. 15.16 (233)(280)(268) The officer or person executing a warrant of arrest shall without unnecessary delay take the person or have him taken before the magistrate who issued the warrant.

2.  Unreasonable force which violated Plaintiff Joe B. McDuffie's Constitutional Right in Amendment VIII of the United States Constitution which states "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted".

**4.**

Plaintiff Joe B. McDuffie brings his action against Defendant Jennifer Keese for:

1.  False statement which led to Plaintiff's arrest, Texas Penal Code 37.08 False Report to Peace Officer or Law enforcement Employee (a) A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to:(1) a peace officer conducting the investigation.  This is also a violation of Plaintiff's "unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness" as described in the Declaration of Independance of the United States.

2.  Defamation in the form of libel by which Defendant gave  false statements exposing Plaintiff to public scorn, hatred, contempt and ridicule.

3.  Perjury-aggravated perjury, US Code 18 Section 1621 Perjury generally: Whoever-(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose or certify trully, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true. Texas Penal Code 37.02 Perjury (a) A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning:(1) he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath, 37.03 Aggravated Perjury (a) A person commits an offense if he commits perjury as defined in Section 37.02, and the false statement: (1) is made during or in connection with an official proceeding.

4.  Inconsistent Statements, Texas Penal Code 37.06 An information or indictment for perjury under Section 37.02 or aggravated perjury under Section 37.03 that alleges that the declarant has made statements under oath, both of which cannot be true, need not allege which statement is false.

5.  False report to get Plaintiff's wife fired from her job as substitute teacher at San Perlita ISD last year(1999-2000).

6.  Tampering with Governmental Record, Texas Penal Code 37.10, (a) A person commits an offense if he: (1) knowingly makes a false entry in, or false alteration of, a governmental record, (5) makes, presents, or uses a governmental record with knowledge of its falsity.

7.  Malicious harassment by retailiation, intimidation and belittling with the express purpose of

denying Plaintiff Joe B. McDuffie the "Unalienable Rights" in the Declaration of Independence of the United States "among these are Life, Liberty, and the pursuit of Happiness".

### 5.

Plaintiff Katherine L. McDuffie brings her action against Defendant Willacy County Navigation District for Civil Rights Violations in the American With Disabilities Act 1990.
1. Discrimination against a qualified individual with a disability by relegation to lesser/no services when Plaintiff Katherine L. McDuffie called for assistance on two occassions December 7, 2000 and December 13, 2000, the Americans with Disabilities Act 1990,Title II Subtitle A Section 201-205. Federal Register/Vol. 56, No. 144/Friday July 26, 1991/Rules and Regulations, Department of Justice 28 CFR PART 35.

### 6.

Plaintiff Katherine L. McDuffie brings her action against Defendant Willacy County Sheriff Department for Civil Rights    Violations in the American With Disabilities Act 1990:
1. Discrimination against a qualified individual with a disability by relegation to lesser/no services as defined in the Willacy County Navigation District Ordinance Section 5 Annual Vaccination and Control of Pets paragraph (i) Any officer or officers of the District is hereby authorized to take such action as is reasonably necessary to prevent any animal from attacking any person or other domestic animal or destroying public or private property, the Americans with Disabilities Act 1990,Title II Subtitle A Section 201-205. Federal Register/Vol. 56, No. 144/Friday July 26, 1991/Rules and Regulations, Department of Justice 28 CFR PART 35.

### V.

### Damages

Due to Defendants bad faith and grossly negligent conduct, Plaintiffs has suffered money damages as to time, effort and money seeking legal advice, involving long distance phone calls, damage to their personal reputation and their family's, great mental and physical anguish for them and their family, time, effort and money to file an ex-parte petition for expungement, and also they have suffered pain and suffering.
Also Plaintiffs sues for punitive damages.
The total amount Plaintiffs is suing for is fifty thousand ($50,000.00) dollars.
Defendants actions were the sole proximate cause of Plaintiffs damages and/or injuries.
Due to Defendants Willacy County Navigation District and Willacy County Sheriff Department's bad faith and discrimination by relegating Plaintiff Katherine L. McDuffie to lesser or no services, Plaintiff Katherine L. McDuffie has suffered great mental and emotional anguish, pain and suffering.

Wherefore premises considered, Plaintiffs prays that all five defendants be cited to appear and answer herein. That after final adjudication, that the five Defendants be ordered to pay jointly and severally and Plaintiffs be awarded damages, plus, pre and post judgment interest, court costs and punitive damages.
Plaintiffs prays for any other relief at law or in equity Plaintiffs are justly entitled to receive.
Plaintiffs demands for judgment for all the other relief to which the Plaintiffs deems themself entitled to receive.

Respectfully Submitted,

Joe B. McDuffie and
Katherine L. McDuffie

**STATE OF TEXAS**
**COUNTY OF WILLACY**

<u>**VERIFICATION**</u>

I herby certify, that I, Joe B. McDuffie and Katherine L. McDuffie, have read all the allegations stated in the Third Amended Original Petition, and all statements are true and correct from our own personal knowledge.

_____
Joe B. McDuffie, *pro se*
Plaintiff

_____
Katherine L. McDuffie, *pro se*
Plaintiff

     SWORN AND SUBSCRIBED TO BEFORE ME, the undersigned notary, on the the **6th** day of
_____, 2001, which witness my hand and seal.

**ARLETTE COLE**
**Notary Public**
**STATE OF TEXAS**
**My Comm. Exp. Mar. 18, 2004**

*Arlette Cole*
_____
Notary Public-State of Texas

*Arlette Cole*
_____
Printed Name of Notary
My commission expires: 3/18/04



PEACE BOND WARRANT
NO. 39092

THE STATE OF TEXAS
TO THE SHERIFF OR ANY CONSTABLE OF ___Willacy___ COUNTY, TEXAS,
GREETING:

You are commanded to take the body of__Joe McDuffy_____, Defendant, and
bring him forthwith before me at the__Willacy___ County Sheriff's Department, in
Raymondville_____, ___Willacy_ County, Texas, then and there to answer a lawful
complaint that he has threatened and is about to commit an offense against the person
of ___Jennifer Keese_____, to-wit:___Terroristic Threat_____

_____

_____

Herein fail not, and have you then and there this Warrant with you return hereon.

WITNESS my signature this the __17th_ day of ____August____, XX8X 2001.

JUSTICE OF THE PEA
PCT._1_, PLACE _1
__Willacy____ Count  Texas

#### RETURN

CAME TO HAND on the _____ DAY OF _____, 19___, at_____ o'clock
_____.M. and
EXECUTED in _____County, Texas, at _____ o'clock ____.M., on the_____
day of _____, 19____, by taking the Defendant into custody and by deli-
vering him to Justice of the Peace, Pct. _____, _____County, Texas as
commanded by the foregoing Warrant of Arrest.

The distance actually traveled by me in the execution of this process was_____
miles, and my fees are $_____.

_____
(SHERIFF,_____COUNTY, TEXAS)

BY

_____
(DEPUTY)
OR

_____
(CONSTABLE, PRECINCT_____,
_____COUNTY, TEXAS)



COPY

RICHARD SOLIS
Justice-of-the-Peace
Precinct 1
Willacy County Correction Facility
Raymondville, Texas  78580

OFFICE PHONE
(512) 689-3381

## PEACE BOND WARRANT

STATE OF TEXAS

COUNTY OF WILLACY

I, _____Jennifer Keese_____, DO SOLEMNLY

SWEAR THAT I HAVE GOOD REASON TO BELIEVE AND DO BELIEVE, THAT

Joe McDuffy, Defendant, has threatened to commit and _____ IS ABOUT TO

COMMIT AN OFFENSE AGAINST MY PERSON, TO WIT:__ Jennifer Keese; that ___

Joe McDuffy, Defendant, has threatened to commit and is about to commit,

. in Willacy County, Texas, the offense of Terroristic Threat,  and did

then and there:  Intentionally threaten to commit an offense involving

violence to Jennifer Keese, namely, Assault with intent to place Jennifer

Keese in fear of imminent serious bodily injury,_____

_____

AGAINST THE PEACE AND DIGNITY OF THE STATE.

*Jennifer Keese*

SWORN TO AND SUBSCRIBED BEFORE ME BY:

_____Jennifer Keese_____,

ON THIS THE _____17th_____ DAY OF ____August_____,

A.D. 19 __2001__ .

RICHARD SOLIS
JUSTICE OF THE PEACE
WILLACY COUNTY, TEXAS

Complaint

**COPY**

STATE OF TEXAS

COUNTY OF WILLACY



DOCKET No. CR- 39205 -

JUSTICE OF THE PEACE, Pct.# 1

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

Before me, the undersigned authority, on this day personally appeared your affiant, who after being by me duly sworn on oath deposes and says that he/she has good reason to believe, and does believe that on or about the 17th day of AUGUST, A.D. 2001 and before the making and filing of this complaint in the County of Willacy, State of Texas; JOE MCDUFFY did then and there:

INTENTIONALLY THREATEN TO COMMIT AN OFFENSE INVOLVING VIOLENCE TO JENNIFER KEESE NAMELY, ASSAULT WITH INTENT TO PLACE JENNIFER KEESE IN FEAR OF IMMINENT SERIOUS BODILY INJURY

TERRORISTIC THREAT - PERSON - 22.07 (a)(2)

AGAINST THE PEACE AND DIGNITY OF THE STATE

_Jennifer Keese_
Affiant

Subscribed and sworn to before me on the 17th day of August 2001,

Magistrate
Justice of the Peace

Warrant of Arrest - Justice of the Peace                                                          Silo Software, Inc. - Austin, Texas

#  WARRANT OF ARREST

**THE STATE OF TEXAS**
        vs.

**JOE MCDUFFY**
303 SOUTH SHORE DR.
PORT MANSFIELD, TX. 78598
DOB: 03/02/1950  SSN: 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

**JUSTICE OF THE PEACE, Pct. #1**

**WILLACY COUNTY, TEXAS**

Docket No. CR- - 39092

Issued Date: August 17, 2001

## THE STATE OF TEXAS

    TO ANY PEACE OFFICER OF THE STATE OF TEXAS, GREETINGS:
YOU ARE HEREBY COMMANDED TO ARREST **JOE MCDUFFY** if to be found in your county and bring him/her before me, the undersigned Justice of the Peace in and for Precinct No. 1 of Willacy County, Texas at my office at the Willacy County Correction Facility at 576 W. Main, Room 101 in Raymondville, Texas in said County, **INSTANTER**, then and there to answer the State of Texas for the offense against the laws of said State, to wit:

    **TERRORISTIC THREATS (MB)** of which **JOE MCDUFFY** is accused by written complaint under oath of **JENNIFER KEESE** filed before me.
    Herein Fail not, but of this writ make due return, showing how you have executed the same.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

    Witness my Official Signature, this 17th day of August, 2001.

_____
Justice of the Peace, Precinct No.

Bond Amount:     $     .00
Fine Cost:       $     .00
Court Cost:      $     .00
Warrant Fee:     $     .00
Total:           $     .00

Ticket Number:              Case Number: CR- - 39092

## OFFICER'S RETURN

    Came to hand the ____ day of _____, A.D. 20_____, at _____ o'clock __.M. and executed the ____ day of _____, A.D. 20 _____, by arresting the within named **JOE MCDUFFY** at _____ in _____ County, Texas and:
    * taking $_____ bond
    * placing the Defendant in the County Jail at _____, Texas to be dealt with by said magistrate according to law.

_____

Sheriff of _____ County, Texas

By _____, Deputy

Date 11/14/01

## CONDITIONS OF ON-GOING DISPUTES

I AGREE TO THE FOLLOWING CONDITIONS:

(1)     Report any incidents that occur even if it may seem insignificant.
        -When calling please give the date, time and location of incident.

(2)     Stay away or avoid the other party(s); to wit: _____

Jennifer Keese          Louis Keese

Example:     If you are at HEB and the other party is there - do not go
            there.  Go back at a later time.

Signature                           PHONE (956) 944-2777

Katherine McDuffee

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **JOE B. MCDUFFIE and KATHERINE MCDUFFIE**<br>**Plaintiffs,**<br><br>**vs.**<br><br>**GUILLERMO SALINAS, JR., HECTOR GARZA, JENNIFER KEESE, WILLACY COUNTY SHERIFF'S DEPARTMENT, and WILLACY COUNTY NAVIGATION DISTRICT**<br>**Defendants** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. B-01-143** |

---

**AFFIDAVIT OF SHERIFF LARRY G. SPENCE**

---

THE STATE OF TEXAS      §

COUNTY OF WILLACY      §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Larry G. Spence, and being by me first duly sworn according to law, upon his oath states:

> "My name is Larry G. Spence, and I am over the age of twenty-one (21) years and competent to make this Affidavit. The facts and statements contained herein are within my personal knowledge and are true and correct.

> "I am, and have been at all times material to this cause of action, the Willacy County Sheriff. I was elected to this position in 1985 and have held it since that time. I received my Basic, Intermediate and Advanced Certificate from the Texas Commission On Law Officer Standards And Education. I also am certified as an instructor by the Commission. I have been in law enforcement for 35 years.

Affidavit of Sheriff Larry G. Spence

**EXHIBIT**

**5**

"As part of my continuing education, I have completed courses in Texas Criminal Law, civil liability, orientation for public officials, law enforcement liability and safety and use of force. The opinions stated herein are based on my education, training and experience of more than 35 years in law enforcement, as detailed above.

"In my capacity as Sheriff for Willacy County, I am personally familiar with the litigation initiated by Mr. and Mrs. McDuffies and the allegations they are making against Deputies Salinas and Garza. I have reviewed the files regarding this matter, and am familiar with the McDuffies' description of what occurred. After considering these materials and information, as well as my training and experience, I am of the opinion that Deputy Salinas and Deputy Garza acted as reasonable officers could have in the same or similar positions.

"Deputy Salinas took the complaint of Jennifer Keese. It was reasonable for Deputy Salinas type Ms. Keese's statement, and to direct her to the Court's notary public. This sworn, eye-witness account was sufficient to lead a reasonable officer to believe that probable cause existed for Mr. McDuffie's arrest. However, Deputy Salinas did not act on the apparent probable cause. Instead, he allowed the Magistrate to make the probable cause determination. Any reasonable officer in the same or similar circumstances could have handled the complaint in the same way. There is no legal standard or policy that requires an officer talk to the accused, before submitting a complaint to the Magistrate. It was reasonable and in compliance with ordinary law enforcement practice for Deputy Salinas to present Ms. Keese's affidavit to the Magistrate when and how he did. There is no evidence that Deputy Salinas had any direct involvement in the issuing of the arrest warrant or the actual arrest of Mr. McDuffie.

"Deputy Garza arrested Mr. McDuffie on the outstanding warrant. Mr. McDuffie complains that he was placed in handcuffs for transport. The transport of individuals in a police vehicle places the police officer in a very vulnerable position. An officer should be paying careful attention to the road, to protect himself, his transportee, and other members of the community. If the transportee was to cause some type of problem or disturbance during transport, there would be little or nothing that the officer could do to protect himself and ensure that he did not jeopardize his safety or the safety of those traveling nearby. This is true even where there is no early indication there will be problems because of the exceptionally high risk to the officer and other drivers or pedestrians in the vicinity. In my years of experience, it is common practice among officers to transport individuals only when they are restrained by handcuffs. In my expert opinion, it is both objectively reasonable and prudent, for officers to follow such a practice, including under the circumstances of this case.

"Mr. McDuffie complains that the handcuffs were too tight. There is no other allegation of unreasonable force. Mr. McDuffie admits that he suffered no bruising or cuts from the handcuffs, and that they caused a temporary discomfort only. It is not unreasonable for an officer to handcuff someone in such a way that the arrestee complains of temporary discomfort as a result.

"Mr. McDuffie complains about the delay in appearing before a magistrate. However, he was magistrated about 12 hours after his arrest. In my experience, this is a very reasonable waiting period, particularly given the hours of the day at issue. Moreover, a reasonable officer might make a short detour on his way to drop off an arrestee. Mr. McDuffie admits that the delay was minimal (Deputy Salinas was in the house less than 2 minutes), and Mr. McDuffie was not exposed to any unreasonable risk of harm or danger during the delay. Neither the 12-hour delay to see the magistrate or the brief detour would lead a reasonable officer to believe he violated Texas law or the United States Constitution, and there is no evidence that it does.

"Reasonable officers in the same or a similar position as Deputies Salinas and Garza could handle their respective situations in the same way that these deputies did so. Further, Affiant sayeth not.

Larry G. Spence

SUBSCRIBED AND SWORN TO BEFORE ME by the said **Larry G. Spence** on the _20_

day of ___March___, 2002, to certify which witness my hand and seal of office.

DAVID MARTINEZ
MY COMMISSION EXPIRES
July 27, 2002

Notary Public in and for
The State of Texas

Affidavit of Sheriff Larry G. Spence                                     Page 3